CAROL A. SOBEL  SBN 84483
COLLEEN M. MULLEN  SBN 299059
JUSTINE SCHEEWEIS  SBN 305672
LAW OFFICE OF CAROL A. SOBEL
3110 Main Street, Suite 210
Santa Monica, California 90405
t. 310 393–3055  f. 310 399-1854
e. carolsobel@aol.com


FERNANDO GAYTAN SBN SBN 224712
SHAYLA R. MYERS  SBN 264054
LEGAL AID FOUNDATION OF LOS ANGELES
7000 S. Broadway
Los Angeles, California 90003
t. 213 640-3983   f. 213 640-3988
e. smyers@lafla.org
Attorneys for Plaintiff CANGRESS

(ADDITIONAL COUNSEL ON NEXT PAGE)

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| CARL MITCHELL, MICHAEL ESCOBEDO, SALVADOR ROQUE, JUDY COLEMAN, as individuals; LOS ANGELES CATHOLIC WORKER, CANGRESS, as organizations,<br><br>　　　　　　　　　PLAINTIFFS,<br><br>v.<br><br>CITY OF LOS ANGELES, a municipal entity; LT. ANDREW MATHIS, SGT. HAMER and SGT. RICHTER , in their individual and official capacities,<br><br>　　　　　　　　　DEFENDANTS. | Case No.:<br><br>CIVIL RIGHTS COMPLAINT:<br><br>42 U.S.C. § 1983: FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS;<br><br>CALIFORNIA CONSTITUTION: ARTICLE I, §§ 7 and 13; CALIFORNIA CIVIL CODE §52.1; COMMON LAW TORT CLAIMS |

PAUL L. HOFFMAN  SBN 071244
CATHERINE SWEETSER  SBN 271142
SCHONBRUN SEPLOW HARRIS &
         HOFFMAN LLP
723 Ocean Front Walk
Venice, California 90291
t. 310 396-0731  f. 399-7040
e. hoffpaul@aol.com
e. catherine.sdshhh@gmail.com

ATTORNEYS FOR PLAINTIFFS

## JURISDICTION AND VENUE

1.      This is an action for injunctive relief and damages pursuant to 42 U.S.C. § 1983 based upon the continuing violations of Plaintiffs' rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1343 based on 42 U.S.C. §1983 and questions of federal constitutional law.  Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.  Supplemental jurisdiction over Plaintiffs' state law claims is pursuant to 28 U.S.C. §1367.

2.      Venue is proper in the Central District in that the events and conduct complained of herein all occurred in the Central District.

## PRELIMINARY STATEMENT

3.      "[T]he greatest of our evils and the worst of our crimes is poverty."[1] Los Angeles has the second largest unhoused population in the nation, but the largest unsheltered community by far. Declaring a "State of Emergency" last Fall, the City Council described this situation as "unprecedented."  The word used in almost every motion and statement by public officials is that Los Angeles has a homelessness "crisis."  According to the Los Angeles Homeless Services Authority (LAHSA) 2015 count, the number of individuals living on the streets of the City in the last two years has increased by approximately 12 percent, as wages stagnated, rents increased dramatically and the affordable housing stock declined in the face of gentrification in formerly low-income neighborhoods across Los Angeles. This translates to almost 5,000 additional individuals, nearly all of whom are living in tents, various makeshift shelters and in their vehicles throughout the city.

---

[1] George Bernard Shaw, "Major Barbara."

4.      According to the LAHSA 2015 count, 25,000 of the approximately 44,000 homeless persons in Los Angeles County are located in the City of Los Angeles.  While the City has made some progress in helping families and veterans to get housed, the same is not true for the remainder of the individual homeless persons.  In 2014, the City projected that there was a 72 percent shortfall between available shelter and the demand for it.  City officials blame the situation Los Angeles faces now on a combination of "a tremendous lack of emergency shelter" and a "chronic shortage of affordable housing."  They estimate that more than 10,000 units a year must be added to the City's housing stock for the next five years to meet the need for "very low-low income households."  However, with thousands of people becoming homeless each month, as reported by the Economic Roundtable, even this estimate seems out of touch with the severity of the situation.

5.      At the first meeting of the newly-formed City Council Homelessness and Poverty Committee last year, Councilmember Bonin began his introductory statement by conceding that the City failed to do what it needed to do after the 2007 settlement in *Jones v. City of Los Angeles*. 444 F.3d 1118 (2006), *vacatur approved per settlement*, 505 F.3d 1006 (9th Cir. 2007).  The *Jones* settlement suspended nighttime enforcement of LAMC § 41.18(d), the ban on sitting, lying, or sleeping on the sidewalk, consistent with the decision of the Ninth Circuit Court of Appeals.  The nighttime enforcement ban remains in effect until an additional 1,250 units of housing are created for chronically homeless persons, half of which must be on Skid Row and the immediate surrounding downtown area.  Almost a decade later, the City has not met this obligation.  In fact, if the low-income housing units lost on Skid Row since 2007 are added into the calculus, few, if any, units have been added toward the *Jones* requirement.

6.      In September 2015, City officials held a press conference, describing a state of emergency regarding homelessness and promising comprehensive

proposals to address this dire situation.  A motion introduced in the City Council on September 22, 2015, characterized the situation as "a moral, humanitarian and public health crisis."  The City promised to commit at least $100 million annually for housing and other services.  More recently, the City announced its long-term plan to address this critical situation.

7.      But the promise has proved to be an empty one because, at the same time that City officials concede the desperate need for these programs, they claim that there is no money to fund them.  Elected officials now talk about putting a bond measure on the ballot next November that, if passed by the necessary two-thirds majority, might provide some funds in a few years.  The Mayor has publicly discounted the bond measure in favor of a $75 tax on each document filed with the City government for commercial developments.  Mayor Garcetti projects this proposal would produce $30 to $40 million dollars annually, far less than the promised $100 million annually calculated as necessary to implement these critical programs.  But, even if this proposal is adopted, it would take several years to generate the projected funds. There is no immediate source of funding for the City that will alter the homelessness crisis soon. In the meantime, the City has begun a renewed vigorous and cruel enforcement of so-called "quality of life" offenses against the homeless, charging many with misdemeanor offenses, jailing them for these quality of life offenses, and seizing and destroying their property.

8.      The need to respond to the increasing numbers of unsheltered individuals in Los Angeles is hardly new and neither is the approach of criminalizing - rather than housing - people who are homeless.  Over the past 25 years, the City's primarily response has been to invest in approaches that address the visible presence of homeless people, without actually reducing the number of residents on the street each night.  These approaches include criminalizing

homelessness and the destruction of homeless people's property. These practices have been repeatedly challenged and struck down by the Court.

9.      In 2006, the Ninth Circuit Court of Appeals enjoined nighttime enforcement of Los Angeles Municipal Code ("LAMC") § 41.18(d), making it a crime to lie, sit or sleep on a public sidewalk any time of day or night anywhere in the City. The Court held that the law, as enforced, violated the Eighth Amendment. *Jones*, 444 F.3d at 1138. In 2014, the Court struck down as unconstitutionally vague LAMC § 85.02, which made it a crime for a person to park or stand a vehicle on any public property in the City if the person "lived" in the vehicle "day to day, overnight or otherwise." *Desertrain v. City of Los Angeles*, 754 F.3d 1147 (9th Cir. 2014).

10.      In 2003, the City was also successfully sued to enjoin a sweeping "stop and frisk" policy instituted immediately after Chief Bratton began his tenure in Los Angeles and now-Chief Beck was the new Captain III at Central Station. *See Fitzgerald v. City of Los Angeles*, CV 03-01876 DDP; 485 F.Supp.2d 1137 (C.D. Cal. 2007). The policy, dubbed "Operation Enough," was to locate probation and/or parole violators or absconders but, in fact, swept up black males on Skid Row without reasonable suspicion. Over the course of six years of litigation, the district court enjoined the practice twice before a final settlement was reached in 2009, requiring the LAPD to provide ongoing training on Fourth Amendment requirements to all patrol officers at Central Station.

11.      In addition to criminalizing homelessness with laws and actions the Court has held to be unconstitutional, the City has also embarked on an unconstitutional campaign to seize homeless people's property and to remove homeless individuals from the public sidewalks. The City has persisted with this approach despite repeatedly being rebuked by the courts. The City was successfully sued three times to stop the unlawful seizure of the personal property of homeless individuals on Skid Row. *See Bennion v. City of Los Angeles*, LASC

Case C637718 (1987); *Justin v. City of Los Angeles*, 2000 U.S. Dist. LEXIS 17881; CV-00-12352 LGB (CD Cal. 2000); *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005 (CD Cal. 2011); *aff'd*, 693 F.3d 1022 (9th Cir. 2013). It has also been sued twice to challenge the same practices in the Venice area.

12.    In the most recent Court case, *Lavan v. City of Los Angeles,* in 2011, after the City was caught seizing and destroying homeless people's shopping carts and belongings, the U.S. District Court granted an injunction against the City of Los Angeles, prohibiting it from seizing property that is not abandoned, evidence of a crime or creates a public hazard, and from destroying that property without first storing for 90 days for someone to be able to claim it. The Ninth Circuit upheld the injunction. 693 F.3d 1022 (9th Cir. 2013).

13.    The City's practices towards people who are homeless have been condemned by the Courts. In affirming the rights of the plaintiffs in *Lavan* the Ninth Circuit underscored that the "simple rule [i.e. notice and an opportunity to be heard by an impartial tribunal] holds whether the property in question is an Escalade or a [tent], a Cadillac or a cart." *Id.* at 1032.

14.    Even as these laws have been struck down and the approaches rebuked, the City continues its criminalization of homelessness. A report issued in 2015 by the City's Chief Administrative Officer, analyzed the resources spent by the City to respond to the homeless in the prior year. The report identified between $87 and $100 million spent indirectly by the City on responses to homelessness. Ninety percent of that money was spent by the LAPD to enforce laws against homelessness such as LAMC Section 41.18(d).

15.    The City has continued to allocate nearly the bulk of its current resources directed to addressing homelessness to target homeless communities as criminals. In the Skid Row area alone, the City employs two Special Details, the East Side Detail and the Safer Cities Initiative, which has now been rebranded RESET. The primary mission of the East Side Detail is to enforce these laws

against homelessness in the Central Division.  Through RESET, the LAPD deploys 50 uniformed officers, six sergeants and a lieutenant to suppress crime in the area.

16.    The City's approach is even more indefensible when viewed against the directives issued by the United States Interagency Council on Homelessness ("USICH"), composed of nineteen federal cabinet and agency heads to organize federal efforts to end homelessness. The most recent USICH report, "Ending Homelessness for People Living in Encampments," is directly on point and counter to the criminalization approach taken by Los Angeles to homeless individuals forced to live on the streets in large part because of the government's failures over decades.

17.    Specifically, the USICH underscored that "forced dispersal" of homeless encampments is inappropriate and undermines the goal of providing services to homeless individuals.  While the USICH underscored the importance of "intensive and persistent outreach and engagement," the City of Los Angeles implemented "intensive and persistent" citations, arrests, and destruction of personal property, putting an already vulnerable community at extreme peril.

## PARTIES

**PLAINTIFFS**

**Carl Mitchell**

18.    Plaintiff CARL MITCHELL has been living on Skid Row for the past several years.  Prior to that time, he lived in various facilities with supportive services.   Mr. MITCHELL lived in a sober living facility for several years, until the building was sold and the facility closed.  After that, Mr. MITCHELL moved to another supportive facility but was forced to move when the building was shut down because of bed bug infestations.  At that time, Mr. MITCHELL came to

Skid Row, where he has been since.  Mr. MITCHELL is almost 62 years old and suffers from several health problems.

19.    On December 15, 2015, Plaintiff MITCHELL was approached by a supervisor in the LAPD and asked if a specific cart belonged to him.  Mr. MITCHELL responded that his carts were the two Hippie Kitchen carts and that the third cart, located on his other side, was not his.  Despite his repeated insistence that the third cart did not belong to him, he was arrested and charged with a misdemeanor for possession of a stolen shopping cart.  Mr. MITCHELL was handcuffed and placed in the back of a patrol car.  He watched as the officer directed that the property in all three carts – his two Hippie Kitchen carts and the third cart – be dumped out and then thrown in the back of a truck.  Mr. MITCHELL's property was not segregated from the property in the purportedly illegal shopping cart that belonged to another person.  Although Mr. MI asked that the officer give him his backpack, with his medications, medical appointment papers and other personal items, his request was rejected.

20.    Mr. MITCHELL had not been arrested for any offense in a decade when this incident occurred.  Although he committed no crime in the first place, his purported "crime" should have been charged as an infraction for a violation of LAMC § 41.45(c) ("Illegal Possession of a Shopping Cart").  Even if charged as a misdemeanor, because Mr. MITCHELL had his identification, he should not have been taken into custody, pursuant to Volume 4, Section 216.66 of the Los Angeles Police Department Manual.   Had this occurred, Mr. MITCHELL would not have had his property taken, and he would not have been taken into custody, charged with a misdemeanor, booked and held for about 18 hours at the Metropolitan Detention Center before being released in the middle of the night.

21.    On the night Mr. MITCHELL was released by the jail, the temperature in Downtown Los Angeles was 40 degrees.  That night, he slept in the cold with only a single blanket he found on the sidewalk as cover.  When he

was released, he was not given any receipt or inventory for the property seized at the time of his arrest.  The only property receipt he received listed his shoelaces, a belt and one or two other items that were on his person when he was arrested.  He was given no notice of where or how his backpack and other property could be reclaimed.  Despite his best efforts, he has been unable to obtain any of his property that was not destroyed.  Mr. MITCHELL had to go to JWCH, also known as Healthcare for the Homeless of Los Angeles, where he is a patient, to replace his medication.  After all of this, Mr. MITCHELL's charges were rejected by the City Attorney, and he was not charged with a crime.

**Michael Escobedo**

22.     Plaintiff MICHAEL ESCOBEDO had his tent taken and destroyed around Christmas Eve 2015.  Mr. ESCOBEDO has severe vision problems that have left him legally blind, uses a white cane to navigate passage on the streets and sidewalks and has the assistance of a support dog he has trained to guide him. In the past, he tried to secure housing in a downtown Residential Hotel, only to be told that they could not accommodate individuals with his disability or with service animals. For the same reasons, Mr. ESCOBEDO cannot access the shelters on Skid Row.  Because his support dog is not a licensed guide dog, he cannot bring her into a shelter.

23.     On the morning that his property was taken, Mr. ESCOBEDO was not informed of any notice that a clean-up of the area was schedule.  Mr. ESCOBEDO left his property in the care of his neighbor while he went to get coffee at about 7 a.m.  When he returned a short time later, he observed that the area of the sidewalk where he kept his property had been taped off with yellow tape and public employees were removing property.  Mr. ESCOBEDO was given a few minutes to take some of his possessions out of his tent, but not the tent.  He observed the tent dumped into the back of a garbage truck by City employees.

After his tent was seized and destroyed, Mr. ESCOBEDO was forced to sleep with only a tarp for protection for several months until he could replace the tent. The tarp was insufficient to protect him from the cold, rain and wind, and he was unable to get more than a few hours sleep each night.  Without the tent, his personal property, including all of his clothes were soaked and became mildewed.

**Salvador Roque**

24.    Plaintiff SALVADOR ROQUE is an unsheltered resident of Skid Row.  He has only been homeless for a few months, following personal events that caused him to suffer severe depression, for which he takes prescription medications.  On the morning of February 23, 2016, he was sweeping the sidewalk area where he sleeps at night when an LAPD patrol car drove by.  The officers in the vehicle used the loudspeaker system to announce that everyone on the block had to take down their tents.  Before Mr. Roque could comply with the order, the officers asked him for identification, ran a wants and warrants check, and found an outstanding charge of a Failure to Appear on a prior infraction.

25.    Mr. ROQUE was handcuffed, arrested and placed in a patrol car.  As he was in the back of the vehicle, he observed LAPD officers use yellow tape to surround his property.  On information and belief, none of the property was booked by the LAPD when Mr. ROQUE was arrested and held on $750 bail.  He was released the following day.  At the time of his release, he was not given a receipt for any of his property.  He has attempted to find his property at several locations, as advised by the LAPD, all to no avail to date.

26.    For the last three weeks, he has stayed with a friend in a Residential Hotel a few nights a week. Most nights, he stays awake all night and sleeps during the day.  As a result of being exposed to the cold and dampness all night, he developed a cough, congestion in his chest and a sore throat.

27.    As Plaintiff ROQUE was being arrested and his property was being seized, the LAPD also took the opportunity to seize the property of his neighbor,

Ernesto Aguirre, who was not at the scene; he was receiving medical care at the JWCH Healthcare for the Homeless clinic.

28.    Defendant City's employees and agents knew that the property next to Mr. ROQUE's property did not belong to Mr. ROQUE, yet they seized them without prior notice. Several individuals attempted to intervene and told the police that the property owner was nearby at Homeless Healthcare for a medical appointment. The City's employees and agents continued to throw away the majority of the property, while one of the bystanders ran to retrieve Mr. Aguirre.

29.    City employees threw away most of the property of Plaintiff ROQUE and Mr. Aguirre, and as to the few items that were not thrown away, including all of Mr. Aguirre's medications, they were commingled with the property of Plaintiff ROQUE.

30.    While all of the City's employees and agents were still on site, Mr. Aguirre, who was in medical distress but had been told what was going on with his property, returned to the scene to retrieve his property, He told the officer in charge at the scene, Sgt. Richter, that he needed his belongings. One of the individuals who had gone to get him also told the LAPD officers that Mr. Aguirre needed his medications, which were now in a bag with Mr. ROQUE's property. Sgt. Richter ignored these entreaties, grabbed the bag with the commingled property and put it in the back of the LAPD truck, which then drove off. During all of this time, Mr. Aguirre was collapsed on the sidewalk, his pleas ignored by Sgt. Richter, who was standing right in front of him. Only after the property was removed did Sgt. Richter call an ambulance to take Mr. Aguirre to the hospital for emergency treatment.

31.    Since his release from custody the following day, Mr. ROQUE has tried multiple times to reclaim his property, including as recently as the date of the filing of this action. Each time, he has been told by the LAPD that he has to go to a different location, or talk to a different person, to see if someone knows

where his property is stored.  All of these efforts are to no avail.  Mr. ROQUE lost everything, including medications, blankets, money and important personal documents, including papers he needed for his medical conditions and his efforts to obtain Social Security disability benefits.  Neither Mr. ROQUE nor Mr. Aguirre received any documents inventorying the property that was taken or giving them notice that the property could be reclaimed.  Mr. ROQUE's property was seized attendant to an arrest; Mr. Aguirre's property was seized without any prior notice and without cause.

**Judy Coleman**

32.    Plaintiff JUDY COLEMAN is a disabled person who is homeless and lives on Towne Avenue.  She suffers from multiple conditions, including severe arthritis in her hips and knees, diabetes, high blood pressure and respiratory problems.  Her health conditions require her to take medication, use medical equipment and test her blood sugar levels regularly.  On February 12, 2016, she was awakened at approximately 4:00 a.m. by an announcement over a loud speaker on an LAPD vehicle.  The announcement was that everyone had to be packed and off the street by 6:00 a.m. because of a clean-up that was going to occur.  The announcement included a warning that anyone who did not comply would be subject to arrest. Plaintiff COLEMAN complied fully with the order, moving all of her property around the corner to Fifth Street.

33.    Soon thereafter, LAPD Lieutenant Mathis approached her about a silver shopping cart about five to six feet away from Ms. COLEMAN.  She told Lt. Mathis that the cart did not belong to her and that she did not know whose it was.  Lt. Mathis responded by insisting that the silver cart was hers now and that she had too much property. He then placed her under arrest for possession of a stolen shopping cart.  Although possession of a stolen shopping cart is an infraction under the Los Angeles Municipal Code, in order to be able to arrest

her, officers charged Ms. COLEMAN with violating a provision of the California Business and Professions Code, a nearly identical state law that allows the violation to be charged as a misdemeanor and therefore, result in arrest.

34.    While Ms. COLEMAN was being arrested, she asked to grab her medication and to allow her to use her walker. The officers refused both requests.

35.    Ms. COLEMAN was held in custody for two days, and was finally released on Sunday, February 14, 2016.   When she was released, she had no medications or other equipment needed for her medical conditions, even though the LAPD was aware of her medical situation and she was provided some treatments while in custody.   She was given a property receipt that listed only that "multiple" bags were stored at the off-site property storage facility.  Because she was released on Sunday, she could not access her property until no earlier than Tuesday.

36.    Following her release, she had no blanket, tent or other items to protect her from the elements.  A few days after her release, she developed pneumonia and was then hospitalized for treatment.

37.     Plaintiff COLEMAN has attempted to retrieve her property without success.  She has called the telephone number on the property receipt she received on her release from custody, but that location is generally unstaffed, making it difficult, if not impossible to recover property.  The signs at the storage location in the parking lot across from the Roybal Building indicate the days and hours that the facility is supposed to be open, but the facility is not staffed..

38.    The appearance date on the citation for violation of the Business and Professions Code was March 10, but no charges have been filed against her to date.

///

///

///

P14

**Los Angeles Catholic Worker**

39.    Plaintiff Los Angeles Catholic Worker, ("LACW") founded in 1970, is an unincorporated lay Catholic community of women and men that operate a free soup kitchen, hospitality house for the homeless, hospice care for the dying and by-monthly newspaper.  Nicknamed the "Hippie Kitchen," the facility is located on the Northeast corner of 6th Street and Gladys Avenue in Skid Row. LACW provides full meals to the community three times a week.  In furtherance of its mission, the Hippie Kitchen associates to provide other services, including access to dental care, over-the-counter medications, podiatry services, toiletries and other personal items.  In furtherance of its mission, for the past several years, the Hippie Kitchen has purchased shopping carts to provide them to unsheltered homeless persons to store and move their personal belongings.

40.    The shopping carts are a bright red with the LACW name marked on the handle and a distinctive sign affixed to the front of each cart, stating that these carts are the private property of LACW and provided as "Shopping Carts for the Homeless."   Over the last three months, employees and agents of the City have seized the carts without lawful justification.  Nearly six dozen carts were rescued by the fortuitous intervention of Plaintiff LACW, returned to Plaintiffs by private shopping cart retrieval companies, which informed LACW that they were given to them by the Los Angeles Police Department, or picked up from a location where the LAPD stores collected carts.  Significantly, in *Lavan*, Defendant City submitted declarations to the Court, attesting that the LAPD would never take a Hippie Kitchen cart and throw away the property in the cart.  Despite the City's averments, the documentary evidence demonstrated that this statement was false and the Court so found. *See Lavan*, 797 F.Supp.2d at 1014 (citing Duncanson Decl. ¶ 5).

41.    As a result of Defendants' actions to seize the Hippie Kitchen carts, Plaintiff LACW has had to expend personnel resources to prevent removal of the

carts and to reclaim the carts once unlawfully taken by Defendants.  In addition, because many carts are never returned by Defendants, LACW has to expend scarce financial resources to replace the carts and some of the property destroyed. The policies of Defendants also interfere with Plaintiff LACW's mission to provide a safe place for the homeless community.  Individuals cannot leave their shopping carts to obtain the assistance provided by the Hippie Kitchen because they risk of losing their property when it is unlawfully seized and destroyed.

**Cangress**

42.    Plaintiff CANGRESS, also known as the Los Angeles Community Action Network ("LA CAN"), is a grassroots, non-profit organization operating in Skid Row for approximately two decades.  More than 800 low-income residents of Skid Row are involved with LA CAN, many of whom are unsheltered each night. The primary purpose of the organization is to organize and empower community residents to work collectively to address systemic poverty and oppression in the community.  Since its founding in 1999, LA CAN has been the only member-driven organization in Skid Row whose goal is to protect the rights and prevent the further disenfranchisement of homeless and poor people in Los Angeles.  LA CAN brings this action on behalf of its members and associates whose property has been seized by employees and agents of the CITY pursuant to the enforcement policies, practices and customs of seizing and destroying property in Skid Row.  As a result of Defendants' unlawful actions, LA CAN has expended personnel resources to try and prevent property from being seized and to try and locate if and where any property was taken so that they can assist their members and associates to recover the property.

**DEFENDANTS:**

43.    Defendant City of Los Angeles ("CITY") is a municipal entity with the capacity to sue and be sued.  It is a Charter City under the laws of the State of

California. The departments of the City of Los Angeles include the Los Angeles Police Department and the Los Angeles Department of Public Works and its departments and agencies.  Employees of the CITY have engaged in the acts complained of herein pursuant to the policies, practices and customs of the CITY.

44.    Defendant Lt. Andrew Mathis, Sgt. Hamer and Sgt. Richter are all supervisors in the Los Angeles Police Department and presently assigned to Central Division.  They are the individual employees of Defendant CITY who were on site and directed the unlawful seizure and destruction of Plaintiffs' property and directed the false arrest of certain of the Plaintiffs on a misdemeanor crime of possession of stolen shopping carts.

45.    Each of the Defendants, their employees and agents, participated personally in the unlawful conduct challenged herein and, to the extent that they did not personally participate, authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiffs.  Each acted in concert with each other.  The challenged acts caused the violation of Plaintiffs' rights.

46.    The identities and capacities of defendants DOES 1 through 10 are presently unknown to plaintiffs, and on this basis, Plaintiffs sue these defendants by fictitious names.  Plaintiffs will amend the Complaint to substitute the true names and capacities of the DOE defendants when ascertained.  Plaintiffs are informed, believe, and thereon allege that DOES 1 through 10 are, and were at all times relevant herein, employees and/or agents of the Defendant CITY and are responsible for the acts and omissions complained of herein.  Defendants DOES 1 through 10 are sued in both their official and individual capacities.

## THE SEIZURE AND DESTRUCTON OF PROPERTY

47.    Despite five lawsuits against it for removing property without adequate pre-deprivation notice or post-deprivation notice, the CITY has returned

to the same unlawful policies and practices.  This time, the due process violations
are compounded by the simultaneous arrests of homeless persons.

48.    On information and belief, since at least December 2015, the Los
Angeles Police Department has had a policy, custom or practice of arresting
homeless individuals for non-violent quality of life crimes which would otherwise
be charged as infractions, and incident to those arrests, seizing and destroying
their property.

49.    Since at least 2013, it has been the City Attorney's policy to charge
a number of quality of life offenses as infractions, a policy which was codified in
an interoffice memorandum. Following the issuance of the Revised Filing
Guidelines for Direct Citations, the Los Angeles Police Department issued a
similar directive, instructing officers to charge these violations as infractions as
well.  The ordinances covered by these customs and procedures include LAMC
§41.18(d), which prohibits sitting, sleeping, or lying on the sidewalk and LAMC
§41.45, which prohibits the "unauthorized removal, use or possession of shopping
carts" that have affixed to them a sign identifying the private business owners.

50.    While law enforcement officers retain discretion to charge these
violations as misdemeanors, the practice of charging these crimes as infractions
was supported by the Los Angeles Police Department, the Los Angeles Police
Commission, and the Los Angeles City Council, following a report by the Los
Angeles Police Department.  The report, which was completed at the direction of
the City Council and approved by both the Police Commission and the City
Council, found that the infraction policy was advantageous both in terms of the
costs and benefits of arrests and consistent with current LAPD practices.  The
review overwhelmingly showed that individuals charged with violations of these
crimes were being cited for infractions and were not being arrested.  For example,
in 2012, the LAPD did not arrest anyone for having a shopping cart in violation
of LAMC Section 41.45(c).

51.     When charged as an infraction, these violations may not form the basis of arrest.  Even when charged as a misdemeanor, the LAPD standard operating procedure and state law provides that a person can be to be cited and released from custody with the issuance of a Notice to Appear, without being taken to a police station or held for any amount of time longer than necessary to issue a Notice to Appear.

52.     Despite this City-wide policy, since at least December 2015, the LAPD has had a custom, policy, or practice of arresting homeless individuals in Skid Row for violations of these quality of life ordinances, in order to seize and destroy their property.

53.     When a homeless individual is arrested for violations of these minor offenses, LAPD has a custom, policy, and practice of contacting the Bureau of Sanitation and Street Services trucks to respond to the scene.  Since at least February 2016, both the East Side Detail and RESET have been assigned a deployment of trash trucks from the Department of Sanitation and Street Services, which are now present in Skid Row every day.

54.     When one of the City departments responds to deal with a homeless person's property, it responds with a trash truck, a flatbed pickup truck, and/or a skiploader.  When an arrestee is taken into custody, the LAPD and responding department tape off a portion of the sidewalk with police tape, warning individuals not to cross or enter the area.  During these sweeps, the area covered by the tape can include other individuals' property.  LAPD officers and City Workers often use this opportunity to seize and destroy property other than the property that belongs to the arrestee.   LAPD officers instruct City personnel to investigate property that does not belong to the arrestee; a single arrest can lead to the clearing of an entire City block.

55.     City workers responding to the property do not use care in handling the property.  It is treated as if it is presumptively trash.  The workers use knives

to rip open tents, destroying them in the process.  They crush the tent poles and items in the tent.  When Bureau of Sanitation responds to a call from the LAPD regarding an arrestee's property, they seize and dispose of nearly all of the property, including tents, blankets, shoes, clothing, and often medications, medical assistance equipment such as walkers, diabetes testing machines and nebulizers, personal documents, and other critical items.  Items that the CITY the Bureau of Sanitation determines should be thrown away are shoveled or thrown in a Department of Sanitation trash truck for immediate disposal.

56.    After an arrestee is taken into custody, the arrestee is not given a chance to deal with their property in any way.  Officers do not allow them to pack up their belongings or to identify items that are critically important, like Identification cards, medications, or family photos.  Even when these items are stored in a single backpack or bag, the officers do not allow the arrestees the opportunity to identify these items, so that the items can be transported with the arrestee and stored for release at the same time arrestee is released from custody. The seizure and destruction of the backpacks is especially troubling because the City Council is considering the City Attorney's proposed revision to LAMC Section 56.11, which would allow unsheltered individuals to keep a backpack only with what the CITY has called "essential" personal property, including medications and personal papers.   Individuals who are arrested are also not allowed to leave their property in the care of another person near them.  Instead, the arrest provides the City of Los Angeles with the opportunity to clear the homeless individual's property from the streets.  The majority of the property is simply thrown away.

57.    If any property is saved, it is bagged, and according to LAPD policy, should be itemized and tagged as the arrestee's excess personal property. Officers and city employees do not take care to ensure that only the arrestee's property is bagged and tagged.  As a result, the property of other arrestees or

individuals who are not arrested, have their property comingled with the arrestees' property.  These individuals cannot get this property back because it is stored under the arrestee's name, and only the arrestee can retrieve the property.

58.    Arrestees' property that is bagged and tagged is not taken and stored along with the arrestee, either at the Metropolitan Detention Center or the County Jail.  As a result, the property is not accessible to the arrestee upon his or her release from custody.  Instead, any small amount of property that is saved from destruction is supposed to be given to the East Side Detail to store at the Central Division "excess property warehouse," a warehouse that the Detail operates.  This warehouse is separate and distinct from the Bureau of Sanitation 90-day storage facility, where property is stored that is seized during Operation Healthy Streets sweeps or when the Bureau of Sanitation picks up property on the streets during any of its now daily cleanings.

59.    If the property is collected by the RESET detail, it is not necessarily transported directly to the warehouse.  Because the East Side Detail only works between the hours of 4:00 a.m. and 2:00 p.m. Monday through Friday, any property that is picked up by RESET outside of these hours is transferred to the Central Division and left by the East Side Detail truck until it can be transported by a member of East Side Detail to the warehouse.

60.    The LAPD's excess property storage facility is not located at the Metropolitan Detention Center or the Parker Center, where arrestees are routinely transported.  Instead, it is located in a hard-to-identify spot in the middle of a parking lot across from the Roybal Federal Courthouse.  The address given for the warehouse leads to the City of Los Angeles parking lot entrance, with prominent signs announcing that only City employees may use the lot.  The Excess Property warehouse sign itself is significantly smaller, and is next to a number of gates that are locked.  In order to access the walkway, one must walk through the main vehicle entrance and through the parking lot to the building.

Individuals can access their property from the warehouse only between the hours of 8:00 a.m. and 1:00 p.m., Tuesday through Friday.   The warehouse is not regularly staffed however; in order to gain access to the facility and their property, an individual must have access to a working and charged telephone, and must call the non-emergency telephone number for the Central Division.   At times, this number is not answered, either by an individual or even a voicemail system.  If an individual is able to contact someone at the Central Division, they must then wait for someone from the East Side Detail to respond to the call to open up the warehouse during the limited hours that the warehouse will be accessed.

61.    Because of the limited hours that the individual can obtain their property, someone who is arrested likely will not be able to obtain their property the day they are arrested and released, if at all.  Anyone arrested later than Thursday afternoon will not be able to obtain their property until Tuesday of the following week, regardless of how long they are held in custody, because the facility is closed.

62.    If an individual manages to find the warehouse when it is open, in order to obtain the property, the arrestee must show a Property Receipt.  Before an arrestee is released, the arrestee is supposed to be given this receipt.  This property receipt should list all items that were stored; however, the LAPD lists the items in vague terms, and does not itemize what has been retained.  The arrestee has no way of knowing what property was stored, and no way of knowing what property was destroyed.  This property receipt provides the arrestee with the sole notice where their property is being housed and how it can be retrieved.  If the arrestee is not given a receipt, they have no way of knowing where the remainder of their property that was not thrown away is being stored.  If another individual's property is stored with the arrestee's property, the property owner will have no way to obtain the property.

63.    Property that is seized during a street cleaning or at any other time other than incident to an arrest is stored at another facility.  Therefore, individuals whose property is seized are left to guess whether their property has been stored and where it can be reclaimed.  Because adequate post-deprivation notice is not provided at the location of the seizure, they must often walk from location to location, trying to search out what City employees did with their property.

## THE HEALTH AND SAFETY RISK TO UNHOUSED PERSONS

64.    A large percentage of the persons living on the streets in Los Angeles have or are at serious risk for health problems.   The risk is greatly increased by several factors, including a lack of shelter, especially in the winter months when it is cold and rains; preexisting health conditions; and the advanced age of many chronically homeless residents.

65.    The danger created for unhoused individuals by the systematic seizure and destruction of their property, including the most basic necessities like medications, blankets, tents and tarps, is obvious and particularly so in the winter.  Although Los Angeles often enjoys warm weather during daytime in the winter, at night the temperature regularly drops to 50 and below.  This crosses the threshold for the risk of hypothermia, and increases the risk of other illnesses that can result from sleeping unsheltered on the streets, particularly in the rain.  Moreover, when the wind-chill factor[2] is included, the threat increases.

66.    The National Oceanic and Atmospheric Administration ("NOAA") utilizes an index that takes into account advances in meteorology,

_____

[2] Wind-chill is the perceived decrease in air temperature felt by the body when skin is exposed to wind.

P23

biometeorology, and computer modeling to create a formula that accurately calculates this perceived temperature, and warns the public about the dangers from exposure to winter winds and low temperatures.  Essentially, this index shows how wind speeds dramatically impact how quickly the human body loses heat.

67.    According to NOAA records, this past December, the average minimum temperature in Los Angeles was 47.1 degrees.  To illustrate, at this temperature, winds of only 5 miles per hour reduce applied temperatures by 2 degrees; winds of 15 miles per hour create a wind-chill factor that reduces the temperature felt by the body by 6 degrees; and winds traveling 25 miles per hour produce a wind-chill factor of -8.1 degrees.  In the rain coupled with lightning and thunder on March 7, 2015, wind gusts reached as high as 33 miles per hour. With a raw temperature of 51 degrees during the storm, the force of the wind resulted in a wind-chill factor of -8 degrees, lowering the temperature to approximately 43 degrees. Thus, even in Los Angeles' so-called "moderate winters," the temperatures experienced by homeless individuals exposed to the elements consistently fall well-below 50 degrees, the threshold where individuals are exposed to hypothermia.

68.    Defendants are well aware of the danger the homeless community faces and recognized it in their plan for the winter shelter program and other emergency pop-up shelters.  But even without this public recognition,, it is plain common sense that protection from the cold and rain is an identifiable human need.  Unprotected exposure to cold and rain presents a serious risk of illness and, as already happened once this winter, death to someone living on the sidewalk with only minimal or no protection once their property is seized and destroyed.  A policy that ignores the "mutually enforcing effect" of destroying property and leaves people to live on the streets manifests actionable deliberate indifference.

69.    The immediate risk to the health and safety of the homeless community far outweighs any element based on the perceived public health hazard that may exist and are used to justify the seizure and destruction of property, like the presence of rat droppings on property, or the fact that personal possessions become wet as a result of the rain.  The CITY is well aware of this. In 2012, after the injunction was entered in *Lavan*, the CITY approached the Los Angeles County Public Health Department to identify public health issues on Skid Row.  On May 21, 2012, Jacqueline Taylor, Bureau Director for Region 1, issued a report on the County's findings.  Significantly, the County did not find that identified health hazards justified the removal and destruction of personal property.  To the contrary, the County opined that if the property was moved regularly and, if possible, kept 18 inches off the ground, such as in a shopping cart or other mobile device, the problem would be alleviated.  Without seizing and destroying the property of homeless persons, the CITY implemented the clean-up policies recommended by the County and, in fact, received a favorable report from the County just a few months later.

70.    Notably, the solution the County directed for most of the issues was to provide additional public toilets, adequate trash bins with frequent disposal of garbage, and access to soap and water to minimize the transmission of disease because people were living on the streets in "desperate situations."   Although the CITY did add a few trash cans in Skid Row since the County issued its report four years ago, there are still only a few toilets, and no soap or water for the number of homeless individuals, which has increased by more than 20 percent since the County issued its report in 2012.

71.    Defendants' present justification for destroying Plaintiffs' property is based on the purported contamination of those items.  This was not a justification the County Public Health Department would sanction in 2012 and it is not a sufficient rationale today.  But even if some of the property is contaminated, this

approach strips Plaintiffs of their constitutional rights precisely because of Defendants' failure to take adequate, let alone any, steps to address the most fundamental needs of homeless persons for a safe environment.  Moreover, the consequence of Defendants' policies and practices is to leave Plaintiffs in the cold, literally.  When Plaintiff MITCHELL was falsely arrested and then released at approximately 3 a.m. on December 16, 2015, the low temperature in Downtown Los Angeles was 40 degrees.  Mr. MITCHELL was released from jail with nothing to protect him from the elements as he slept on the sidewalk that night other than a thin blanket he found in someone else's cart.

## FIRST CAUSE OF ACTION
### Right to Be Secure From Unreasonable Seizures
### 42 U.S.C. §1983 - Fourth Amendment; Art. 1, §13, California Constitution

72.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

73.     Defendants and their employees and agents violated Plaintiffs' Fourth Amendment rights to be free from unreasonable seizure of their property by confiscating and then destroying Plaintiffs' property without a warrant.

74.     Defendants and their employees and agents violated Plaintiffs MITCHELL's and COLEMAN's rights to be free from false arrest.

75.     These unlawful actions were done with the specific intent to deprive Plaintiffs of their constitutional rights to be secure in their property.

76.     Plaintiffs are informed and believe that the acts of the Defendant and their employees and agents were intentional in failing to protect and preserve Plaintiffs' property and that, at minimum, Defendants were deliberately indifferent to the likely consequence that the property would be seized and destroyed unlawfully, based on the past circumstances of similar constitutional and statutory violations of the law.

77.     As a direct and proximate consequence of these unlawful acts, Plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property personal injury.

## SECOND CAUSE OF ACTION
## RIGHT TO DUE PROCESS OF LAW; 42 U.S.C. § 1983
## FIFTH AND FOURTEENTH AMENDMENTS; ART. I, § 7

78.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

79.     Defendants, their employees and agents, owed Plaintiffs a duty under the due process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, § 7 of the California Constitution to protect the personal property of the Plaintiffs.  This duty applied to preserving the personal property of individuals arrested and taken into custody.

80.     Despite this well-defined duty, Defendants provided Plaintiffs with no notice that their property was at risk of being seized and/or destroyed and did not act to preserve the property or provide any means of reclaiming it in a timely manner, even though Defendant CITY was put on notice by the Los Angeles Superior Court, the United States District Court for the Central District of California and the Ninth Circuit Court of Appeals that such notice and preservation of property was required.

81.     Plaintiffs are informed and believe that the acts of the Defendants, their employees and agents, were intentional in failing to protect and preserve Plaintiffs' property and that, at minimum, Defendants were deliberately indifferent to the likelihood that the property would be seized and destroyed without due process based on the past occurrences of these same constitutional and statutory violations of the law.

82.     Defendants have seized and destroyed the personal property of the Plaintiffs without due process, lawful justification, or just compensation.

83.     As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property and other injury to their person.

## THIRD CAUSE OF ACTION
### Violation of Civil Rights: 42 U.S.C. § 1983, Fourteenth Amendment State Created Danger

84.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

85.      By taking and destroying the medicine, tents, tarps and blankets of the Plaintiffs, the acts of Defendants, their employees and agents, have created a danger for Plaintiffs by exposing them to the elements in the winter without adequate shelter on the streets.

86.     As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiffs have suffered and continue to suffer actual and potential injury to their health and safety and are entitled to compensatory damages for their property and other injury to their person.

## FOURTH CAUSE OF ACTION
### Violation of Civil Rights: Interference By Threat, Intimidation or Coercion California Civil Code § 52.1

87.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

88.     Defendants' agents and employees have used arrests, threats of arrest and intimidation to interfere with Plaintiffs' rights to maintain their personal possessions in the exercise of Plaintiffs' rights secured by the Constitution of the United States, the Constitution of the State of California, and the statutory laws of the State of California.

89.     Plaintiffs are entitled to an injunction pursuant to California Civil Code §52.1.  Plaintiffs are also entitled to damages pursuant to Civil Code §§ 52 and 52.1.  Plaintiffs have filed tort claims with the Defendant CITY.  Plaintiffs will amend this action to include damages under this provision once they have exhausted their administrative remedies.

## FIFTH CAUSE OF ACTION
### California Civil Code § 2080, *et seq.*

90.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs 1 through 28 as though fully set forth hereat.

91.     Defendant's policies, practices and conduct challenged herein violated California Civil Code § 2080 *et seq.*, in that Defendant's agents and employees failed to protect and preserve the personal property of Plaintiffs when the property was on the public sidewalk and streets; failed to provide written notice that the property would be taken and failed to provide post-deprivation notice so that Plaintiffs would have the opportunity to reclaim it within a reasonable time.  California Code of Civil Procedure § 2080 *et seq.* imposes a mandatory duty to maintain property that is not abandoned.

## SIXTH CAUSE OF ACTION
### CONVERSION

92.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

93.     Plaintiffs were in possession of their personal property at the time that Defendants' agents and employees ordered that the property be seized and most, if not all of it, be immediately destroyed without prior notice.  Defendants' agents and employees unlawfully prohibited Plaintiffs from securing their personal property.

94.    Defendants, their agents and employees, had a duty owed to Plaintiffs to protect their personal property under Los Angeles Municipal Code §52.55 and California Civil Code §§ 2080.2, 2080.4 and 2080.6.  Plaintiffs' property was not abandoned at the time that Defendant seized it and immediately destroyed it.  Defendants breached the duty to protect Plaintiffs' personal property when their agents and employees wrongly exerted dominion over the property and denied Plaintiffs' their constitutional and statutory rights.

95.    Defendants had no legitimate governmental interest that gave their agents and employees the legal right or justification to confiscate Plaintiffs' property and then immediately demolish it without prior notice to Plaintiffs and without a procedure to permit Plaintiffs to recover their property, and without fair compensation to Plaintiffs.

96.    As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages

### SEVENTH CAUSE OF ACTION
### FALSE ARREST

97.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

98.    Plaintiffs MITCHELL and COLEMAN were falsely arrested for possession of "illegal" shopping carts.  Defendants were informed that the carts in question were not theirs.   Despite this, Defendants arrested Plaintiffs.  No charges were filed against either Plaintiff.

99.    As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiffs have suffered and continue to suffer injury.

///

///

///

## INJUNCTIVE RELIEF

100.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

101.     A real and immediate difference exists between Plaintiffs and Defendants regarding Plaintiffs' rights and Defendants' duty owed to Plaintiffs to protect Plaintiffs' personal property present on public sidewalks and streets in Skid Row.  Defendants' policies and actions have resulted and will result in irreparable injury to Plaintiffs.  There is no plain, adequate or complete remedy at law to address the wrongs described herein.  Defendants have made clear by their repeated escalation of the criminalization of the homeless community in Los Angeles that they intend to continue these practices of confiscating and immediately destroying the property of homeless individuals from the public streets and sidewalks without a warrant and notice.  Defendants have also made clear that they intend to continue the practices described above that make it impossible for homeless individuals to reclaim their property, even when some of it is not immediately destroyed.  Unless restrained by this Court, Defendants will continue to implement these unlawful policies and practices.

102.     Defendants' acts alleged above violate established constitutional rights of Plaintiffs and Defendants could not reasonably have thought that the conduct of their agents and employees in seizing and destroying Plaintiffs' property was lawful.

103.     An actual controversy exists between Plaintiffs and Defendants in that Defendants, their agents and employees, have engaged in the unlawful and unconstitutional acts alleged herein and intend to continue to do so.  Plaintiffs claim that these acts are contrary to law and seek a declaration of their rights with regard to this controversy.

104.     As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiffs have suffered and will continue to suffer

damages through injury to their person and the loss of their personal property, including all of their clothing, bedding, medication, personal papers and other personal possessions, stripping them of the essentials needed for their well-being and personal dignity and putting them at serious and immediate risk of illness.

105.    Plaintiffs have filed administrative claims with the Defendant CITY.

**WHEREFORE**, Plaintiffs pray as follows:

1.    For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendants from engaging in the policies, practices and conduct complained of herein;

2.    For a declaratory judgment that Defendants' policies, practices and conduct as alleged herein violate Plaintiffs' rights under the United States and California constitutions and the laws of California;

3.    For an order directing Defendants to provide replacement blankets, tents, tarps, medications, clothing and replacement of critical personal documents to anyone whose property is seized for whatever reason, including purported public health and safety grounds;

4.    For an order directing that any property taken be segregated by owners and not combined with the property of any other person;

5.    For damages in an amount to be determined according to proof.

6.    For costs of suit and attorney fees as provided by law;

///
///
///
///
///

7.     For such other relief as the Court deems just and proper.

Dated: March 14, 2015          Respectfully submitted,

LAW OFFICE OF CAROL A. SOBEL
LEGAL AID FOUNDATION OF LOS ANGELES
SCHONBRUN, SEPLOW, HARRIS & HOFFMAN


_____ /s/ Carol A. Sobel
By: CAROL A. SOBEL
Attorneys for Plaintiffs