Carol A. Sobel (SBN 84483)
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Avenue. Suite 300
Santa Monica, California 90401
Tel: (31) 393-3055
carolsobel@aol.com

Shayla R. Myers (SBN 264054)
**LEGAL AID FOUNDATION
OF LOS ANGELES**
7000 S. Broadway
Los Angeles, CA 90003
Tel: (213) 640-3983
Fax: (213) 640-3988
smyers@lafla.org

Catherine Sweetser (SBN 271142)
**SCHONBRUN SEPLOW HARRIS
& HOFFMAN, LLP**
11543 Olympic Boulevard
Los Angeles, California
Tel: (310) 396-0731
Fax: (310) 399-7040
catherine.sdshhh@gmail.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| Carl Mitchell, et al., | ) CASE NO. 16-CV-01750 SJO (JPR) |
| Plaintiff(s), | ) [Assigned to Hon. S. James Otero, Courtroom 10C] |
| vs. | ) **PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN OPPOSITION TO [PROPOSED] INTERVENORS' MOTION TO INTERVENE; DECLARATION OF SHAYLA MYERS IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE; EXHIBITS A-K.** |
| City of Los Angeles, et. al. | ) |
| Defendant(s). | ) **DATE:** **August 12, 2019** |
| | ) **TIME:** **10:00 a.m.** |
| | ) **COURT:** **Courtroom 10C** |

1

---

Plaintiffs respectfully request this Court take judicial notice of the following documents, in support of Plaintiffs' Opposition to the Motion to Intervene:

### 1.  Los Angeles City Council File 18-0751

Pursuant to Federal Rules of Evidence 201, the Court may take judicial notice of facts that are readily ascertainable by reference to a reliable source.  Fed. Rule Evid. 201.  *See also* 1-201 Weinstein's Federal Evidence § 201.02 (2d Ed).

City Council files kept by the Clerk of the City of Los Angeles are a matter of public record and the accuracy of the documents attached herein may be compared to the official records maintained by the City, including by comparison to the electronic file maintained by the Los Angeles City Council on its official city website, available at https://cityclerk.lacity.org/lacityclerkconnect/index.cfm?fa=c.search&tab=cfi.

The specific council file, including the index of File Activities and Council Vote information is available at https://cityclerk.lacity.org/lacityclerkconnect/index.cfm?fa=ccfi.viewrecord&cfnumber=18-0751.

The documents are official publications and self-authenticating.  See Fed. Rule Evid. 902(f). *See also* Declaration of Shayla Myers, attached, establishing authenticity of the printed versions of the documents, attached as Exhibits A-H.

### 2.     Office of Mayor Eric Garcetti, "Confronting the Crisis:  Helping our Homeless Neighbors," July 8, 2019.

The report was published online by the City of Los Angeles at https://www.lamayor.org/confronting-crisis-helping-our-homeless-neighbors.  The documents are official publications and self-authenticating.  *See* Fed. Rule Evid. 902(f). *See also* Declaration of Shayla Myers, attached, establishing authenticity of the printed version of the document, attached to the declaration as Exhibit K.

3.     Proceedings from the meeting of the Los Angeles City Council Committee on Homelessness and Poverty from September 7, 2018, October 3, 2018, February 6, 2019.

Dated: July 15, 2019

Legal Aid Foundation of Los Angeles
Law Office of Carol A. Sobel
Schonbrun Seplow Harris & Hoffman, LLP

BY: /s/ _____

       Shayla Myers
       Attorneys for Plaintiffs

**REQUEST FOR JUDICIAL NOTICE**

# DECLARATION OF SHAYLA MYERS

I, Shayla Myers, declare:

1.  I am an attorney admitted to practice before this court.  I am an attorney of record and represent plaintiffs in this action.  I have personal knowledge of the facts set forth below and, if called to testify to those facts, would do so competently.

2.  Attached to this Request for Judicial Notice are documents from Council File 18-0751, entitled "Carl Mitchell, et al., v. City of Los Angeles, et. al."

3.  On July 15, 2019, I caused to be generated from the City Clerk's website, which is maintained by the City of Los Angeles, an Index of the council file, which lists all activities and documents in the council file.  The specific website from which I generated this index is https://cityclerk.lacity.org/lacityclerkconnect/index.cfm?fa=ccfi.viewrecord&cfnumber=18-0751.   A true and correct copy of the Index is attached as Exhibit A.

4.  On July 15, 2019, I also caused to be printed the attached documents from the City Clerk website, which are attached as Exhibits  B-H.

   a.  City Attorney Report R19-0144

   b.  Speaker Cards, Homeless and Poverty Committee, September 7, 2018

   c.  Speaker Cards, Homelessness and Poverty Committee, October 3, 2018

   d.  Communication from the Public, September 10, 2018

   e.  Speaker Cards, February 6, 2019

   f.  Communication from the Public, March 5, 2019

   g.  Speaker Cards, March 6, 2019

5.  On July 15, 2019, I reviewed the Los Angeles Downtown Industrial District Business Improvement District, "About" section.  The website for the LADID and the attached pages are available here:  http://www.industrialdistrictla.com/about

4

A true and correct copy of those pages is attached as Exhibit I.

6.      The report "Confronting the Crisis:  Helping our Homeless Neighbors," was published online by the Office of the Mayor of the City of Los Angeles and on the City website, www.lamayor.org, and is publicly available. I caused the specific page, available at https://www.lamayor.org/confronting-crisis-helping-our-homeless-neighbors, to be accessed and printed, A true and correct copy of the report is attached as Exhibit J.

7.      In 2017, Plaintiff Los Angeles Community Action Network (LA CAN) released a report, "Dirty Divide:  Out of Service," which highlights the need for bathrooms, trash receptacles, and other public health infrastructure in Skid Row. I was at the time of the publication an attorney of record for LA CAN, and I received a copy of the report from LA CAN.  A true and correct copy of the report is attached as Exhibit K.


I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th day of July, 2019 in Los Angeles, California.


BY:  /s/ _____
       Shayla Myers

**REQUEST FOR JUDICIAL NOTICE**

Exhibit A

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Office of the City Clerk, City of Los Angeles

This report was generated by the Council File Management System on 07/15/2019
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Council File Number**
18-0751

**Title**
Carl Mitchell, et al. v. City of Los Angeles, et al.

**Last Change Date**
05/24/2019

**Expiration Date**
05/17/2021

**Reference Numbers**
City Attorney Report: R18-0257; R19-0144,Reference: 2:16-cv-01750-SJO-JPR;
16-cv-01750-SJO(JPRx),Related Council File: 18-0390

**Action History for Council File 18-0751**

| Date | Activity |
|------|----------|
| 05/24/2019 | Mayor transmitted Council File to City Clerk. |
| 05/23/2019 | City Clerk transmitted file to Mayor. Last day for Mayor to act is June 3, 2019. |
| 05/22/2019 | Council approved the City Attorney's recommendations forthwith. |
| 05/17/2019 | City Clerk scheduled item for Council on May 22, 2019 . |
| 05/17/2019 | City Attorney document(s) referred to Budget and Finance Committee. |
| 05/16/2019 | Document(s) submitted by City Attorney, as follows: |

City Attorney report R19-0144, dated May 16, 2019, relative to the request to discuss in closed session settlement in the case of Carl Mitchell, et al. v. City of Los Angeles, et al.

| Date | Activity |
|------|----------|
| 03/06/2019 | Council discussed this matter in closed session and instructed City Attorney staff to settle this matter. |
| 03/01/2019 | City Clerk scheduled item for Council on March 6, 2019 . |
| 02/01/2019 | Homelessness and Poverty Committee scheduled item for committee meeting on February 6, 2019. |
| 10/03/2018 | Homelessness and Poverty Committee continued item to/for a date to be determined. |
| 09/28/2018 | Homelessness and Poverty Committee scheduled item for committee meeting on October 3, 2018. |
| 09/07/2018 | Homelessness and Poverty Committee continued item to/for a date to be determined. |
| 09/06/2018 | Homelessness and Poverty Committee scheduled item for committee meeting on September 7, 2018. |
| 09/05/2018 | Budget and Finance Committee waived consideration of item . |
| 08/20/2018 | Council Referral per Council President to also include Homelessness and Poverty Committee. |
| 08/13/2018 | City Attorney document(s) referred to Budget and Finance Committee. |
| 08/10/2018 | Document(s) submitted by City Attorney, as follows: |

City Attorney report R18-0257, dated August 10, 2018, relative to a request to discuss in closed session pending litigation in the case of Carl Mitchell, et al. v. City of Los Angeles, et al.

Exhibit B



**MICHAEL N. FEUER**
CITY ATTORNEY

REPORT NO. **R 1 9 - 0 1 4 4**
**MAY 1 6 2019**

## REQUEST FOR CLOSED SESSION PURSUANT TO
## GOVERNMENT CODE SECTION 54956.9(d)(1)

REPORT RE:

***Mitchell, et al., v. City of Los Angeles, et al.***
USCD Case No. 16-cv-01750 SJO (JPRx)
(CF No. 18-0751)

The Honorable City Council
of the City of Los Angeles
200 North Spring Street
City Hall, Room 395
Los Angeles, California 90012

Honorable Members:

This office recommends that discussions with, and advise form, legal counsel regarding the recommendation for City Council action in this pending litigation be scheduled and held in closed session pursuant to California Government Code Section 54956.9(d)(1). Government Code Section 54956.9(d)(1) requires you to state publicly prior to the closed session, what subdivision of this section authorizes the closed meeting, and that the closed session is being held to confer or discuss with, or receive advice from, legal counsel regarding pending litigation.

This matter involves litigation that alleges constitutional violations based on the seizure and destruction of property of homeless individuals in the Skid Row area of Los Angeles.

The Honorable City Council
 of the City of Los Angeles
Page 2


        If you have any questions regarding this matter, please contact Senior Assistant
City Attorney Scott Marcus at (213) 978-4681.  He, or another member of this Office,
will be present when you consider this matter to answer any questions you may have.

                        Very truly yours,

                        MICHAEL N. FEUER, City Attorney

                        By

                                SCOTT MARCUS
                                Senior Assistant City Attorney

SM:glt

Exhibit C

Item NO. (1) - 18-0751

# SPEAKER REQUEST LIST

**Meeting: SPECIAL MEETING - HOMELESSNESS AND POVERTY COMMITTEE**

**Date: 9/7/2018 9:00AM**

The names listed below reflect individuals who requested to speak on this particular Council file. These individuals may not have actually provided testimony during the meeting. Please refer to the audio and/or video recording of the meeting to determine which individuals actually provided testimony.

| NAME: | ADDRESS:<br>(IF PROVIDED) | REPRESENTING:<br>(IF PROVIDED) | PAID SPEAKER:<br>(IF PROVIDED) |
|---|---|---|---|
| Andy Bales | | | |
| Kevin Murray | Weingart Center | | |
| Georgia Berkovich | Midnight Mission | | |
| Ruth Schwartz | Shelter Partnership | | |
| Anita Nelson | SRO Housing | | |
| Tom Gilmore | Gilmore Associates | | |
| Lew Horne | CBRE | | |
| Jerry Neuman | DLA Piper | | |
| Jessica Lall | CCA | | |
| Jessica Duboff | LA Area Chamber | | |
| Carl Cade | Tribune Real Estate | | |
| Kevin Litwin | LR Group | | |
| Greg Spiker | Ken Spiker And Assoc | | |
| Blair Besten | Historic Core BID | | |
| Larry Rauch | LA Cold Storage | | |
| Nick Griffin | Downtown Center BID | | |
| Andrew Thomas | Westwood BID | | |
| Miguel Vargas | Arts District BID | | |
| Brady Westwater | | | |
| Mark Chatoff | California Flower Mall<br>825 San Pedro St<br>Los Angeles, Ca. 90014 | | |
| Herman ADvocate HHH 42 USC1983 | | | |
| David Brown | Home Owner Association<br>315e 8th St#401<br>La, 90014<br>(315) 663-6314 | | |
| Shayla Myers | Legal Aid Foundation Of Los Angeles | | |
| General Dogon | | | |
| Patrick Cooper | | | |

| | | | |
|---|---|---|---|
| Rabbi Moshe Greenwald | | | |
| Chris Chebegia | | | |
| David Ikegami | Litle Tokyo | | |
| Jed Parriott | | | |
| Ariana Gomez | | | |
| Gloria 88022 Text | | | |
| Kaleb Havens | | | |
| Josephina 88022 Text | | | |
| Amara Ononiwu | | | |
| Peggy Lee Kennedy | | | |
| Eric Preven | | | |
| Estela Lopez | Downtown Industrial BID | | |
| Scott Yamabe | Flower Market | | |
| Suzanne Holley | Downtown Center BID | | |
| Carol Schatz | Downtown Center BID | | |
| Nick Griffin | Downtown Center BID | | |
| Joanne Kumamoto | Little Tokyo BID | | |
| George Yu | Chinatown BID | | |
| Keith Giles | | | |
| Laurie Sale | | | |
| Linda Becker | | | |
| Laurie Sale | | | |
| Mr. Brown K. | | | |
| General Jeff | | | |
| Wayne Da Nigga Fooo Aka Encino | | | |
| John Sundermeyer | | | |
| Claudia Oliveira | | | |
| Patti Berman | | | |
| Phom Niggertz | | | |
| Miguel Nelson | | | |
| Ariana Nussdorf | | | |
| Josh Gray-Emmer | | | |
| Pat Barrett | | | |
| Steve Diaz | | | |
| George Huzzett | | | |

Exhibit D

**Item No. (4) - 18-0751**

# SPEAKER REQUEST LIST

### Meeting: HOMELESSNESS AND POVERTY COMMITTEE

### Date: 10/03/2018

The names listed below reflect individuals who requested to speak on this particular Council file. These individuals may not have actually provided testimony during the meeting. Please refer to the audio and/or video recording of the meeting to determine which individuals actually provided testimony.

| NAME: | ADDRESS: (IF PROVIDED) | REPRESENTING: (IF PROVIDED) | PAID SPEAKER: (IF PROVIDED) | COMMENT |
|---|---|---|---|---|
| Jessica Lall | | | Central C | General Comment |
| Mike Arnold | | | | Against Proposal |
| Jessica Lall | | | | Against Proposal |
| Bert Dezzutti | | | | Against Proposal |
| Mark Loranger | | | | Against Proposal |
| Ruth Schwartz | | | | Against Proposal |
| Martha Saucedo | | | | Against Proposal |
| Javier Cano | | | | Against Proposal |
| Charlie Woo | | | | Against Proposal |
| Jessica Duboff | | | | Against Proposal |
| Ellen Riotto | | | | Against Proposal |
| Rena Leddy | | | | Against Proposal |
| Sarah Wiltfong | | | | General Comment |
| Teddye Sluyter-Coak | | | | Against Proposal |

| | | | |
|---|---|---|---|
| Suzanne Holley | | | Against Proposal |
| Nick Griffin | | | Against Proposal |
| Carl Cade | | | Against Proposal |
| Miguel Nelson | | | Against Proposal |
| Ryan Aubry | | | Against Proposal |
| Stuart Morkun | | | Against Proposal |
| Lisa Gritzner | | | Against Proposal |
| Jim White | | | Against Proposal |
| Jason Lee | | | Against Proposal |
| Terry Rubinroit | | | Against Proposal |
| Rasmus Lee | | | Against Proposal |
| Max Gallardo | | | Against Proposal |
| Shane Waarboek | | | Against Proposal |
| Pat Barrett | | | Against Proposal |
| Phillip Lin | | | Against Proposal |
| Zack Clark | | | Against Proposal |
| James Okazaki | | | Against Proposal |
| Yukio Kawaratani | | | Against Proposal |
| Ericka Claustro | | | Against Proposal |
| Mark Chatoff | | | Against Proposal |
| Elisa Keller | | | Against Proposal |
| Larry Rauch | | | Against Proposal |
| Miguel Nelson | | | Against Proposal |
| Sarah Wiltfong | | | Against Proposal |
| Josh Gray-Emmer | | | General Comment |

| | | | | |
|---|---|---|---|---|
| Jerard Wright | | | | Against Proposal |
| Linda Becker | | | | General Comment |
| Laurie Sale | | | | General Comment |
| Mark Chatoff | | | | General Comment |
| Georgia Berkovich | The Midnight Mission | The Midnight Mission | | General Comment |
| Hal Bastian | | | | General Comment |
| Patti Berman | | | | Against Proposal |
| Hilary Norton | | | | Against Proposal |
| Blair Besten | | | | Against Proposal |
| Ariana Nussdorf | | | | General Comment |
| Timothy Anderson | | | | General Comment |
| Sara Hernandez | | | | Against Proposal |
| Claudia Oliviera | | | | General Comment |
| Ellen Endo | | | | General Comment |
| Wallis Locke | | | | Against Proposal |
| Ryan Afari | | | | General Comment |
| George Campos | | | | General Comment |
| Claudia Oliveira | | | | Against Proposal |
| Ryan Afari | | | | Against Proposal |
| Bruce Curry | Hotel Indigo 899 Francisco La, CA. 90017 (213) 232-8551 | Hospitality Community | | General Comment |
| Simon Ha | | | | Against Proposal |
| Pat Barrett | | | | General Comment |

Exhibit E

         

September 10, 2018

Councilmember José Huizar
City of Los Angeles, Council District 14
Los Angeles, CA 90012

Re: *Mitchell v. City of Los Angeles*

Dear Councilmember Huizar,

We are a diverse coalition of civic, business and community leaders dedicated to making our city a vibrant and welcoming place. We are writing this letter to share our thoughts on the pending court case *Mitchell v. City of Los Angeles*. As you know, this is a case filed against the City of Los Angeles in the Central District of California by the Legal Aid Foundation of Los Angeles and Carol Sobel. The case is currently before United States District Judge S. James Otero with a pending trial date of February 9, 2019. **As the representative of the Downtown area, we are asking that you continue to lead the conversation regarding this important case.**

<u>**Background**</u>

Originally filed in March 2016, the complaint alleges that the City of Los Angeles, through the Los Angeles Police Department (LAPD), has undertaken a mass policy of arresting people experiencing homelessness for quality of life offenses in order to confiscate and destroy their property. In particular, plaintiffs allege:

o   The City summarily confiscates the personal property of people experiencing homelessness without legally sufficient cause, including personal identification, tents and medication.

o   The City fails to properly catalogue property seized from people experiencing homelessness, making it difficult to claim.

o   The City stores property seized from people experiencing homelessness in warehouses that are challenging to access.

o   The City failed to provide people experiencing homelessness with adequate notice of scheduled public clean-ups in Downtown.

<u>**Current Status**</u>

On April 13, 2016, the district court issued a preliminary injunction against the City. The court accepted plaintiffs' allegations as true for the purpose of formulating its order, and it held that the alleged conduct of the City raised Fourth Amendment privacy and Fourteenth Amendment Due Process concerns. Judge Otero's preliminary injunction only relied on facts brought by the plaintiffs, refusing to give the City's counterevidence any consideration because it was "at best inconclusive," which is a highly unusual process for courts even at this preliminary stage.

The court's preliminary injunction applies only to the Downtown area between Spring and Alameda Streets and between 3rd and 8th Streets. When referring to Downtown in this letter we are referencing the above-mentioned area. The order requires the City to:

o   Only confiscate property of people experiencing homelessness where there is a legally sufficient justification.



- o   Store confiscated property in facilities that are open during regular business hours, that are accessible within 72 hours of seizure, and that clearly catalog property based on names and identification.

- o   Maintain property confiscated in Downtown for at least 90 days before destroying it, and to provide notice to people experiencing homelessness as to where their property is stored.

- o   Provide advance public notice at least 24 hours before public street clean-ups in Downtown.

Many of these requirements have already been adopted by the City in Los Angeles Municipal Code (LAMC) 56.11 – Storage of Personal Goods. On July 5, 2018, the parties agreed to postpone the previously scheduled trial date of October 9, 2018 to February 9, 2019 in order to "continue to engage in further discussions" "to resolve this dispute." In the stipulation agreement the City Attorney represented that this delay was necessary because "the City Council is currently in recess and is therefore unavailable to provide guidance to the City regarding its discussions in this matter."

**We believe this new timeline provides the City Council with the opportunity to fully discuss this case and its implications for Downtown and the entire city.** This discussion is especially important as the City has made significant progress on the issue of homelessness since the preliminary injunction was issued in 2016, including Proposition HHH and an update to LAMC 56.11 with the development of associated protocols. There are also new actions that should be considered like the "A Bridge Home" initiative and the dedication of additional revenues from the State budget surplus.

The City has the ability to settle the *Mitchell* case in accordance with the current injunction so it only applies to Downtown, enter into a citywide settlement or go to trial. **We encourage the City to go to trial. If a trial is not possible, the City should explore a citywide settlement that is consistently applied throughout the city and discuss those terms with a broad and diverse group of stakeholders.** Settling this case without a robust and open dialogue would set a troubling precedent. We strongly feel that a settlement limited to Downtown is unreasonable and would expose the City to future litigation**.**

<u>Policy Considerations</u>

There are many policy considerations the City Council should address in settling the *Mitchell* case. Currently the injunction effectively eliminates the 60-gallon limit on personal goods established in LAMC 56.11 only for Downtown. If the City were to settle *Mitchell* with the current terms, this standard could become permanent. We can do better by providing housing and creating incentives for people experiencing homelessness. **We are very concerned that permanently setting a different standard in one neighborhood of Los Angeles is unconstitutional and would set the City up for litigation in other neighborhoods.**

**We also believe a Downtown-only settlement would continue the over-concentration of people experiencing homelessness, services and housing in Downtown, and ultimately further decrease the quality of life for those currently experiencing homelessness in Downtown who need individualized treatment and care to live safely and reenter society**. By eliminating the 60-gallon limit, people experiencing homelessness with large amounts of personal property will likely keep their items only within the Downtown area set aside by the order. This will result in further densification of the population of people experiencing homelessness in Downtown and make it more challenging to provide housing, services and facilities to meet the current need.

In March 2016, the City Council adopted a motion that you authored calling for housing, services and facilities for people experiencing homelessness to be provided throughout the city and county and to formally reverse the policy of containment that has led to an over-concentration of people experiencing homelessness in certain parts of the city and county. The Downtown area included in *Mitchell* has the highest concentration of people experiencing homelessness, services, housing and facilities in the county. This raises an important question: **What**

          

**precedent does it set for building permanent and interim housing for people experiencing homelessness and the "A Bridge Home" initiative if the area with the most services and housing for people experiencing homelessness is the place without limits on personal goods on the public right-of-way?** Services, facilities and housing for people experiencing homelessness are the answers to ending the issue of homelessness. They are not the precursor to allowing unlimited personal goods on the public right-of-way. The City Council should continue to pursue solutions to ending homelessness.

**Perhaps most troubling with the proposed solution is the implication that those who currently have housing or are engaged in services to get off the streets in Downtown deserve less than those who live in the rest of the city.** Downtown represents the largest concentration of service and housing providers anywhere in the city. It is bad public policy to deny people in Downtown the same rights that we provide to other residents around the city of Los Angeles. People in Downtown deserve safe and clear sidewalks without being threatened, offered drugs or falling victim to human trafficking.

Although we agree that we need to prevent further over-concentration of homeless services in Downtown, we have been supportive of the many desperately needed homeless services that have opened since *Mitchell* was filed in 2016, including The Bin (a storage facility for the personal goods of people experiencing homelessness), a sobering center and the Refresh Spot. We also believe that the greater Downtown area can and should do more. As an example, while not located in the *Mitchell* area, we are incredibly supportive of the El Pueblo interim housing project and the neighboring pilot project storage bin. But we know that homelessness is a countywide crisis and should be treated accordingly. Downtown cannot have separate standards from the rest of the city.

**We know creating separate standards for Downtown has serious implications, and we hope you will consider this when discussing the *Mitchell* case in closed session.** We have and will continue to raise these issues with the City Attorney and other members of the City Council as well.

Thank you for your consideration and continued commitment to ending homelessness.

Sincerely,

**Michael Arnold**
President & CEO, The Midnight Mission

**Rev. Andrew J. Bales**
CEO, Union Rescue Mission

**Bert Dezzutti**
Executive Vice President, Western Region, U.S. Office Division, Brookfield Properties

**Tom Gilmore**
CEO, Gilmore Associates

**Lewis Horne**
Chair, Central City Association DTLA Initiative

**Noel Hyun**
CEO & President, The Brooklyn Companies

**Paul Keller**
Chairman, Mack Real Estate Development

**Jessica Lall**
President & CEO, Central City Association

**Kevin Murray**
President & CEO, The Weingart Center Association

**Maria Salinas**
President & CEO, Los Angeles Area Chamber of Commerce

**Stuart Waldman**
President, Valley Industry & Commerce Association

         

**CC:** Mayor Eric Garcetti, City of Los Angeles
City Attorney Mike Feuer, City of Los Angeles
City Council President Herb Wesson, City of Los Angeles
Councilmember Marqueece Harris-Dawson, Chair, Homelessness & Poverty Committee
Councilmember Mike Bonin, Member, Homelessness & Poverty Committee
Councilmember Curren Price, Member, Homelessness & Poverty Committee
Councilmember Monica Rodriguez, Member, Homelessness & Poverty Committee

Exhibit F

# SPEAKER REQUEST LIST

## Meeting: HOMELESSNESS AND POVERTY COMMITTEE

### Date: 02/06/2019

The names listed below reflect individuals who requested to speak on this particular Council file. These individuals may not have actually provided testimony during the meeting. Please refer to the audio and/or video recording of the meeting to determine which individuals actually provided testimony.

| NAME: | ADDRESS: (IF PROVIDED) | REPRESENTING: (IF PROVIDED) | PAID SPEAKER: (IF PROVIDED) | COMMENT |
|---|---|---|---|---|
| Wayne From Nigga Encino | | | | General Comment |
| Laurie Sale | | | | General Comment |
| Blair Besten | | | | General Comment |
| S | | | | General Comment |
| Kiri | | | | General Comment |
| Kirk Gaw | | | | General Comment |
| Betsy Starman | | | | General Comment |
| Daniel Peterson | | | | General Comment |
| Shawn Smith | | | | General Comment |
| Scott Yamabe | | | | General Comment |
| Patti Berman | | | | General Comment |
| Nicholas Previsich | | | | General Comment |
| Alexandra Leh | | | | General Comment |
| Jed Parriott | | | | General Comment |
| Terry Rubinroit | | | | General Comment |

| | | | | |
|---|---|---|---|---|
| Howard Rubinroit | | | | General Comment |
| Olivia Lee | | | | General Comment |
| Jessica Lall | | | | General Comment |
| Tom Gilmore | | | | General Comment |
| Ellen Riotto | | | | General Comment |
| Mike Arnold | Midnight Mission | | | General Comment |
| Devin Strecker | | | | General Comment |
| General Dogon | | | | General Comment |
| Antonia Ramirez | | | | General Comment |
| Pete White | La Can 838 S. 6th | | | For Proposal |
| Clqudia Oligeira | | | | General Comment |
| Rena Leddy | | | | General Comment |
| Claudia Oliveira | Dlanc | | | Against Proposal |
| Pat Barrett | | | | General Comment |
| John Deubler | | | Downtown Management 541 S. Spring St. Los Angeles, CA. 90012 (213) 688-1100 | Against Proposal |
| Cq | | | | General Comment |
| Carl Cade | | | | General Comment |
| Suzanne Holley | | | | General Comment |
| Hal Bstian | | | | General Comment |
| Jasmine | | | | General Comment |
| | Axis | | | |

| Marcus Hamm | 1100 S Hill St Los Angeles CA 90015 | | | General Comment |
| Linda Becker | | | | General Comment |
| Craig Roberts | | | | General Comment |
| Jasmyne Ho | | | | Against Proposal |

Exhibit G



March 4, 2019

Council President Herb Wesson
Los Angeles City Council
200 N. Spring Street
Los Angeles, CA 90012

Re: *March 6th City Council: Item 18-Mitchell v. City of Los Angeles*

Dear Council President Wesson,

Every year, the homeless count provides us with hard data to assess the region's performance at housing our most vulnerable population. No matter the results of this year's count, we can tell by the number of people living on the streets that the City of Los Angeles is still facing a humanitarian crisis. As Angelenos anxiously await the results of this year's homeless count, we want to highlight one of the most important issues related to homelessness that you and your colleagues on the City Council will be discussing: *Mitchell v. City of Los Angeles (Mitchell)*.

From September 2018 to February 2019, the City Council's Homelessness and Poverty Committee held three closed session discussions with representatives from City Attorney Mike Feuer's office regarding *Mitchell.[i]* At the public portion of these hearings, more than 100 speakers came to City Hall to let their representatives know how they feel about the case, demonstrating high public interest in this issue. Because the discussions were conducted in closed session and kept confidential, the public has not learned whether the City plans on settling the case – including possible settlement terms – or taking the case to trial. At the last committee meeting in February, the committee ultimately moved the matter to City Council without a recommendation.

As the legislative body for L.A., we are pleased that the full Council will soon be deliberating over this citywide policy issue. While there may be attempts to present *Mitchell* as a legal matter that will only impact Downtown L.A., we must recognize that as a false premise: it is a legal case that has far-reaching policy implications. The City is already involved in similar litigation in the Venice area, *Cooley v. City of L.A. (Cooley)*, and any action taken on *Mitchell* will impact *Cooley*, LAMC 56.11, "A Bridge Home" and certainly the entire city.

LAMC 56.11 & *Mitchell*

On March 14, 2016, *Mitchell* was filed by Legal Aid Foundation of Los Angeles (LAFLA) against the City alleging that LAPD had undertaken a mass policy of arresting homeless individuals in Downtown for quality of life offenses in order to confiscate and destroy their property.[ii] The case was filed at a time when the City had no regulations related to the use of the public right-of-way for maintaining personal property. This case is currently before U.S. District Judge S. James Otero with a pending court date of June 2019.

After years of policy work from the Council, on April 6, 2016, the City Council voted to approve a revision to LAMC 56.11 which placed a 60-gallon limit on personal goods in public areas, required 24-hour notice before any personal goods could be removed and mandated 90 days of storage of personal goods confiscated by the City.[iii] This revision of LAMC 56.11 created an approach that struck a balance between the twin goals of safeguarding individual property rights and providing accessible and safe sidewalks to the public. This was the City's first policy on how to manage personal property in the public right-of-way.

1



On April 13, 2016, Judge Otero issued a temporary restraining order in the *Mitchell* case. The timing was unfortunate, because it prohibited implementation of the revisions to LAMC 56.11 that the Council had just approved a week earlier in the Downtown area specified in *Mitchell*. This effectively eliminated the 60-gallon limit on personal goods for a part of Downtown.

On May 11, 2016, the City Attorney filed a motion for clarification of the temporary restraining order.[iv] The clarification was sought for two items: scope of the community caretaking exception when a person is arrested and the treatment of bulky items. LAFLA objected to the request for clarification.

The Court declined to rule on the scope because it "goes beyond simplifying clarifying the Order and instead asks the Court to rule on a complex issue of constitutional law." The City also asked for clarification to determine if it is permitted to confiscate and destroy bulky items pursuant to the revised LAMC 56.11 which allows for the immediate removal and destruction of certain items that cannot fit within a 60-gallon container. Tents, operational bikes, wheelchairs, walker or crutches are excluded from this list. The Court declined to clarify and stated, "To the extent that the City seeks a decision regarding the constitutionality of LAMC 56.11, it must do so in a setting that squarely raises that issue."

We commend the City Attorney for seeking clarification and understand Judge Otero's decision to defer these items. *Mitchell* is clearly setting the stage for litigation on LAMC 56.11 and if we settle with terms that are inconsistent, it will help make the case that 56.11 is unconstitutional. We believe LAMC 56.11 demonstrates the City's commitment to protecting people's property as well as their constitutional rights. We all agree that the medicine and family photos of a person experiencing homelessness should be protected, and LAMC 56.11 and the associated guidelines for implementation make that clear.

Concerns with *Mitchell*
Since the *Mitchell* injunction was issued in 2016, we have seen the conditions in Downtown steadily worsen. Piles of belongings entangled with trash and debris, creating unhealthy conditions, are a common sight. Worse yet, we now are experiencing a typhus outbreak throughout Downtown. **We firmly believe that every individual – including the most vulnerable – is entitled to the full benefit of the U.S. Constitution's protections. We believe that the injunction has created serious public health implications and applying a reasonable limit on personal goods will help create healthier conditions while still providing individuals with the Constitution's protections.**

The injunction effectively eliminated any limit on personal goods just for an area of Downtown. **This creates different standards for one neighborhood of L.A., which we believe is unconstitutional and sets the City up for further lawsuits.**

Due to the concentration of homeless residents and services in Downtown, there is the greatest need for a reasonable limit on personal goods in public areas. **If *Mitchell* is settled with no limit on personal goods in the area with the most homeless services, it is unreasonable to believe that any other part of the city would be able to have more restrictive standards.** *Mitchell* will establish the baseline for the entire city and that is why we feel strongly that settling *Mitchell* with no limits on personal goods except for specific bulky items would be even worse for the City than losing at trial. If the City loses at trial, there is always the ability to appeal to a judge who can provide a clear road map for the City to follow. **If the City settles the case, the only way to change the settlement terms is to return to the plaintiffs and seek agreement.** This is important to consider when using taxpayer dollars to fund litigation.



**We are concerned that settling *Mitchell* would threaten the "A Bridge Home" program**. This program is a good first step towards providing housing as a fundamental right in L.A. After El Puente, the first site in the program, opened in Downtown in September 2018, LAFLA submitted a letter outlining their next lawsuit arguing that enforcing LAMC 56.11 in special enforcement zones is unconstitutional. We are glad the Council will also be discussing this at the same meeting as the Mitchell discussion.

<u>Settlement Terms</u>
We believe a draft settlement agreement has been discussed among the City Attorney and members of the City Council. We are deeply concerned that it is being presented favorably as maintaining the status quo. We believe that is not true. We cannot have a settlement agreement that essentially codifies the *Mitchell* injunction, even if there is an attempt to limit the time period of its application. We can all agree that the inhumane conditions that exist today cannot continue.

A time-limited settlement agreement will tie the City's hands and dilute both the implementation and effectiveness of the City's recent comprehensive homelessness policies such as "A Bridge Home." Additionally, a settlement made with plaintiffs does not give the City any flexibility. If circumstances change, the City would have to go back to the plaintiffs for new terms instead of being able to go directly to a judge.

<u>Requests</u>
We ask you to consider the following recommendations when deliberating the *Mitchell* case.

- Our coalition of social service providers and community leaders submitted a <u>letter</u> last September to the City Council asking to **reject a Downtown-specific settlement.** We ask that you not single out Downtown and consider the inequality of treating people in one neighborhood differently.

- CCA is greatly concerned that the public has not had the ability to learn about the potential citywide implications of a proposed settlement of the *Mitchell* case. To that point, **we ask the Council to consider releasing a draft of the settlement terms to allow the public to weigh in before taking official action.** We believe this will elevate the public discourse on this important citywide policy matter and provide transparency while increasing accountability.

- When discussing settlement terms, we ask you to consider the following:
  - **Geography** – We should presume any settlement terms for one area would become citywide. This occurred with *Lavan v. City of L.A.* We need a solution that works for the entire city.
  - **Time** – Any time limits in a settlement will not work. It will be impossible to shift back once a standard has been set as evidenced by *Jones v. City of L.A.*
  - Any settlement terms need to be **consistent with city policies already in place**.

- **We ask that you consider *Mitchell* comprehensively and assess the impacts a settlement would have on not only Downtown, but the entire city.** L.A. has been mired in a cycle of lawsuits that has dictated the City's policy on homelessness. We support ending that cycle and enabling a more proactive, productive approach to homelessness. These lawsuits tie the City's hands in making policy and undermine the work that the Council has done to address homelessness. You've done significant work on Proposition HHH, Measure H, "A Bridge Home" and the revision of LAMC 56.11.



- The City Council and the City Attorney have the ability to **hire outside counsel to assist with *Mitchell* and related litigation including LAMC 56.11, "A Bridge Home", *Cooley*, and revision of LAMC 41.18 and we recommend that they do so**. These are very complex matters that require a tremendous amount of time from City staff. We believe having additional resources will be beneficial to the City to develop a comprehensive strategy and provide a more complete picture of how these items relate to one another.

- **The City has the ability to present LAMC 56.11 to a court and ask for a constitutional review.** The City Council may consider asking the City Attorney to do this in order to prepare for challenges related to "A Bridge Home."

- Due to *Martin v. City of Boise* the City has restricted enforcement of LAMC 41.18 (a) and (d) and suspended enforcement of LAMC 41.18 (b) and (c). **The City needs to make LAMC 41.18 consistent with LAMC 56.11 by allowing sleeping in tents from 9 p.m. to 6 a.m. and other amendments.**

Conclusion

CCA is committed to working collaboratively to end homelessness and fully supports constitutional protections for all people. Downtown is home to the most supportive services, housing, and shelter options for people experiencing homelessness, but we can and should do more. The Refresh Spot, El Puente and The Bin are all examples of good work that we support. We stand ready to work to end this humanitarian crisis. Thank you for your consideration.

Sincerely,

Jessica Lall
President & CEO
Central City Association

Cc:     The Los Angeles City Council
        Mayor Eric Garcetti
        City Attorney Mike Feuer
        Chief Michel Moore, LAPD
        The Honorable S. James Otero

---

[i] https://cityclerk.lacity.org/lacityclerkconnect/index.cfm?fa=ccfi.viewrecord&cfnumber=18-0751
[ii] https://www.clearinghouse.net/detail.php?id=15286
[iii] http://clkrep.lacity.org/onlinedocs/2014/14-1656-s1_ORD_184182_4-11-16.pdf
[iv] https://www.clearinghouse.net/detail.php?id=15286

4

Exhibit H

**Item No. (18) - 18-0751**

# SPEAKER REQUEST LIST

### Meeting: COUNCIL MEETING

### Date: 03/06/2019

The names listed below reflect individuals who requested to speak on this particular Council file. These individuals may not have actually provided testimony during the meeting. Please refer to the audio and/or video recording of the meeting to determine which individuals actually provided testimony.

| NAME: | ADDRESS:<br>(IF PROVIDED) | REPRESENTING:<br>(IF PROVIDED) | PAID SPEAKER:<br>(IF PROVIDED) | COMMENT |
|---|---|---|---|---|
| Don Garza | | | | General Comment |
| Pancake | | | | General Comment |
| Howard Rubinroit | | | | General Comment |
| Don Steier | | | | General Comment |
| Estela Lopez | | | | General Comment |
| Erica Claustro | | | | General Comment |
| Claudia Oliveira | | | | Against Proposal |
| Rabbi Moshe Greenwld | Jewish Community Cejter Downtown Chabad | | | General Comment |
| Roger Gendron | | | | Against Proposal |
| Jeffrey Briggs | Atty Hollywood, | | | General Comment |
| Sergio Moreno | | | | General Comment |
| Shayla Myers | | | | General Comment |
| Betsy Starman | | | | General Comment |
| Ave Mrti | | | | General Comment |

| Dave Martin | | | | General Comment |
|---|---|---|---|---|
| General Dogon | | | | General Comment |
| Adam Rice | | | | General Comment |
| John Deubler | | | Downtown Management 541south Spring Street Los Angeles, CA. 90013 (213) 688-1100 | Against Proposal |
| Don Steier | | | | General Comment |
| Julia Joseph | | | | Against Proposal |
| Wayne From Goddamn Encino | | | | General Comment |

Exhibit I



The **L.A. Downtown Industrial District BID** is widely recognized as a vital response for greater public safety and maintenance of the industrial area by deploying public safety ambassadors and cleaning teams. LADID is

# managed by a board of property and business owners.




The L.A. Downtown Industrial Business Improvement District (BID) was formed in 1998 by the Central City East Association (CCEA). CCEA is a 501(c)(6) not-for-profit business corporation – the principal advocate for property owners, businesses, employees and residents on 46 blocks of Downtown Los Angeles. CCEA administers the L.A. Downtown Industrial Business Improvement District (BID), spanning the area from San Pedro Street to Alameda; 3rd to 8th/Olympic Blvd.

**Property owners contribute more than $2 million annually to support LADID programs and services, and a 2-member management team directs the day-to-day operations.**

**DISTRICT MAP   (/SITES .ES/DID-MAP-PG)**

# Board of Directors

**Mark Shinbane**
Chair
Ore-Cal Corporation/
Fisherman's Outlet

**Matt Klein**
Vice-Chair
HBK Investments

**Ernie Doizaki**
Secretary
Kansas Marine

**Dilip Bhavnani**
Treasurer
Legendary
Developments, LLC

**Andrew J. Bales**
Union Rescue Mission

**Drew Bauer**
Young's Market
Company

**Richard Gardner**
L.A. Wholesale Produce
Market

**Carolyn Leslie**
Atlas Capital / ROW
DTLA

**Howard Klein**
Ocean Beauty Seafood

**Larry Rauch**
Los Angeles Cold
Storage

**Bob Smiland**
Inner City Arts

# Staff

**Estela Lopez**

Executive
Director

elopez@centralcityeast.org

**Jesse Ramirez**

Operations
Manager

jramirez@centralcityeast.org

**FOLLOW US**

**SUBSCRIBE TO OUR NEWSLETTER**

**Email Address**    **SIGN ME UP**

© 2019 Central City East Association    Terms & Privacy

Site by Creative Pursuits (http://cpursuits.com) & Facility (http://www.facilitydesignco.com/)



(/)

**NEXT MEETING:**

**Board of Directors Meeting**

**7.10.19 @ 8:30AM**

**DOWNLOAD AGENDA**

**(HTTP://WWW.INDUSTRIALDISTRICTLA.COM**

**/SITES/DEFAULT/UPLOADS**

**/AGENDAS**

**/071019%20BID%20AGENDA.PDF)**

**Board of Directors**
**meetings**
**are held bimonthly at:**

**725 S. Crocker Street**
**Los Angeles, CA 90021**

**DISPATCH**
**HOTLINE**

213.228.8484
Ext. 210

**PUBLIC SAFETY**

Mon - Fri
5:30AM - 7PM

Sat
7AM - 3:30PM

**OFFICE**
**ADDRESS**

725 S Crocker St
Los Angeles, CA
90021

**MAINTENANCE**

Mon - Fri
6AM - 3PM

Sat
7AM - 3:30PM

Exhibit J

Case 2:16-cv-01750-SJO-JPR   Document 123-1   Filed 07/15/19   Page 42 of 72   Page ID
#:1397

How can we help? (/how-can-we-help)        About Mayor Garcetti (/about)        Meet the Team (/our-team)

Our Work (/OurWork)        Press Room (/PressRoom)

# CONFRONTING THE CRISIS: HELPING OUR HOMELESS NEIGHBORS

JULY 8, 2019

**Homelessness is a humanitarian crisis — an urgent and complex problem facing our city, state, and nation. The latest Los Angeles Homeless Services Authority annual count made it clear that this remains an emergency on our streets and in our neighborhoods, and we have to do more, faster, to combat it.**

**Today, Mayor Garcetti joined City Council President Herb Wesson, State Senator Holly Mitchell, and State Assemblymember Miguel Santiago for a press briefing on how L.A. is responding to the homelessness crisis.**



Posted by **Mayor Eric Garcetti**
11,736 Views

---

## GOOD NEWS FROM SACRAMENTO

Mayor Garcetti ran through a series of updates on our progress and spoke candidly about the
challenges we face. And he started with good news from Sacramento: last week, Governor Newsom
and state legislators made homelessness a priority in the state budget.

Los Angeles will receive $124 million of those state funds, a 46% increase from our city's allotment last
year. Mayor Garcetti proposes investing in six priorities:

1. Preventing Homelessness, with a more than $14 million investment in supporting our eviction
   defense program, emergency rental assistance, and other efforts to reunify people with their
   families and keep them in their homes.
2. Bridge Housing, with nearly half of these state funds dedicated to adding shelter beds and getting
   interim housing sites open faster than before.
3. Innovative and Alternative Permanent Housing Models, with more than $9 million going to
   initiatives like shared housing, master-leasing motels, or rental subsidies for especially vulnerable
   populations.
4. Skid Row, with more than $7 million of new funding directed to our place-based strategy at
   ground zero of this crisis.
5. Youth Homelessness, with about $10 million specifically designated to keep homeless young
   people from becoming chronically homeless.

6. Public Health, with $16.5 million used to pair hygiene resources with housing, outreach, and
employment services — so people can have a clean and healthy environment while they rebuild
their lives and access housing.

The details and final amounts will be worked out with our City Council, after considering feedback from
the public and our non-profit partners. But this money cannot come soon enough — and when it does,
our team will ensure that it is spent as quickly as possible to make a difference on our streets.



**STREET STRATEGIES**

There has been a lot of attention on the condition of our streets and its impact on the health and safety
of our communities.

Here's a sample of what's been happening on our streets and sidewalks:

- In three weeks in June, our city's outreach teams made over 1,200 contacts with individuals
  experiencing homelessness.
- Last month, our sanitation crews conducted 500 comprehensive cleanups near homeless
  encampments, removed more than 1,300 tons of solid waste, and cracked down on illegal
  dumping sites.
- We have saturated the zones around our A Bridge Home shelters with resources, services, and
  outreach.
- This Thursday, the City's first-ever Public Health Task Force will convene its first meeting —
  bringing together, in one place, oversight on all of our public health initiatives, including illegal
  dumping and rodent abatement.

Soon, you'll also see our revamped Sanitation strategy in action, as we redeploy our resources and grow
our workforce to handle more frequent cleanups and daily trash collection; increase public health
resources at encampments; deliver regular hygiene services; and bring our comprehensive cleaning
and rapid engagement, or CARE, teams to areas of highest need.



---

## BRIDGE HOUSING

Until we have enough affordable and supportive housing up and running, we need temporary solutions to get more people off the streets and indoors.

That's why Mayor Garcetti started our A Bridge Home shelter program last fall. Since then, four facilities have opened: El Puente, which is downtown near El Pueblo; the YWCA and Schrader in the Hollywood area; and Casa Azul in Westlake. Altogether, they are providing a total of 222 beds with services to homeless Angelenos drawn from nearby high-density encampments.

We have 21 more bridge housing shelters in development across the City in every Council District but one — with more than 1,900 beds expected to open up over the next 12 months — and there are more shelters in the works.



## AFFORDABLE, SUPPORTIVE, AND PERMANENT HOUSING

From day one, the Garcetti administration has set out to grow the supply of housing and expand the number of affordable and supportive units across our city.

Our first target: build 100,000 new units of housing by 2021 — a goal we will soon reach, two years ahead of schedule.

Next up, we are working to increase affordable housing in L.A by:

- Charging developers a "linkage fee" to raise $50-100 million a year for new affordable housing over the next decade.
- Hiring 4 new staffers in my office of City Homelessness Initiatives just last month to speed up approvals for homeless housing.

Finally, we need more supportive housing that gets chronically homeless Angelenos housed permanently:

- With Prop. HHH dollars in-hand, we have 110 of these projects in the pipeline — when complete, that'll mean more than 7,400 new units.
- By early 2020, we will see a total of 327 additional units open their doors, 224 of them designed for our homeless neighbors.



## SKID ROW

The epicenter of this crisis is Skid Row. With the initial State funds received last year, we directed $20 million here to expand hygiene infrastructure and improve and expand cleanups in the community.

On the public health front:

- After the typhus cases last year, we can report today that cases of flea-borne typhus have

returned to baseline levels, with just a single case reported in 2019.

- This fall, we will quadruple the size of our ReFresh Spot — a personal care center that provides showers, toilets, and laundry facilities for Angelenos experiencing homelessness — increasing the number of washers, dryers, and drinking fountains, and adding new community spaces for Skid Row residents.

There's more to come, including:

- A new BIN facility to expand the units where Skid Row residents can safely store their most valuable belongings.
- A new, $2 million Skid Row Street Cleaning Program that will employ about 20 residents of Skid Row to provide trash pickup five days a week.
- New crisis beds for women in Skid Row at Downtown Women's Center, set to open this month, and new crisis units to serve families from Skid Row.



**ADVOCACY**

We know that we cannot tackle this emergency alone. We now need more assistance from our nation's capital to get the job done. Here's what Mayor Garcetti did in June to attract more federal attention to our crisis:

- Hosted Congresswoman Maxine Waters and several members of L.A.'s congressional delegation at City Hall to discuss federal legislation on homelessness.
- Led a coalition of mayors from across the country to call on Congress to pass Congresswoman Maxine Waters' Ending Homelessness Act and legislation introduced by Senator Dianne Feinstein and Congressman Ted Lieu to expand services and housing.
- Invited the federal government to be our partner, because this issue is not about politics. It's about saving lives.

**As the Mayor mentioned in his last letter to the people of Los Angeles,**

our ability to turn adversity into progress is what makes us a true City
of Angels. That's what L.A. did after the Northridge earthquake, the
civil unrest of 1992, and the Great Recession.

We don't run from a challenge — we rise to it. And we will do so once
again.

Email*          Zip          **GET UPDATES**

**Mayor Eric Garcetti**

*City of Los Angeles*

📍 200 N. Spring St.,
   Los Angeles, CA 90012

📞 +1-213-978-1028

✉️ mayor.helpdesk@lacity.org

311 (https://myla311.lacity.org/)

City Data (https://data.lacity.org)

City Directory
(https://www.lacity.org/your-
government/government-
information/city-directory)

Neighborhood Info
(http://neighborhoodinfo.lacity.org/)

Search

© 2015. All rights reserved.   Disclaimer (/terms) | Privacy Policy
(/privacy)

Exhibit K

# *2017 UPDATE*
# DIRTY DIVIDE: "OUT OF SERVICE"

## A CASE STUDY OF PUBLIC HEALTH INEQUITY
## SKID ROW, LOS ANGELES

 

*November 2017*

**A report of the Los Angeles Community Action Network**



## 1. INTRODUCTION

From complaints made in 1987 to 2017, the City of Los Angeles still has not sufficiently addressed the issue of public health inequality in Skid Row. Disadvantaged communities still face water insecurity, infrastructure deficiencies, and financial barriers to sustainable solutions. Los Angeles's absolute failure to provide adequate housing and public health infrastructure in Skid Row has persisted for decades. Mayors Tom Bradley, Richard Riordan, James Hahn, and Antonio Villaraigosa all largely ignored the health and housing needs of their poorest residents, who were disproportionately Black, and refused to develop policies needed to avert the long-standing humanitarian crisis.

So, instead of parks, water, and hand washing stations, poor communities received paddy wagons; instead of porta-potties and supplies we received additional police and patrol cars; and, instead of being treated with dignity and respect the community was punished for existing in spaces in which we were not welcome. Thirty years later the pattern continues and compliance with any form of public health standards is non-existent.

The City's recent commitment to "hygiene centers" is a step in the right direction but is grotesquely inadequate. Community efforts to address housing needs, public health inequity, and large scale criminalization of houseless people living in Skid Row as human rights violations have long been disregarded by the City as it continues to breach domestic, national, and international legal requirements.  The City has not recognized, or is simply ignoring, the human impact of its violations to underserved communities. Angelenos must feel confident that our City is taking steps toward implementing sustained and comprehensive solutions for Los Angeles's houseless crisis and the inhumane conditions in which houseless communities are forced to live.

The recent outbreak of Hepatitis A in Los Angeles was forewarned in the Department of Public Health's (DPH) corrective actions in 2012. DPH warned the City of the potential risks to such outbreaks and provided guidance and instruction on compliance and prevention. The City of Los Angeles has yet to implement the corrective actions and mitigate the impacts of an otherwise avoidable crisis. The necessary actions to contain the virus are clear: an increase in public restrooms, shower facilities, hand-washing stations, vaccinations, and a public awareness campaign to warn against the known risk factors.

This report provides a context to guide efforts to achieve public health equity. It identifies key aspects of legislation that City agencies should consider when making decisions that impact our most vulnerable and marginalized members, and how they should advance basic human rights.

The City should employ the recommendations outlined in this document to develop and issue policy guidelines to all agencies with responsibilities that impact public health equity. Officials must ensure conduct and decision-making remains ethical; that their actions do not produce harm and respect is shown to social values. Meaningful community participation can enhance the legitimacy and effectiveness of planning, empower marginalized communities, promote sustainable solutions, and improve accountability. The Los Angeles Community Action Network and underserved communities throughout Los Angeles stand ready to work with local, state, and national agencies to realize the human right to housing, water and sanitation but we also stand poised to fight should those agencies waver in their obligations.

1

> *"As poverty deepens and housing prices rise, government support for affordable housing has evaporated, leaving in its wake a combination of homeless shelters and aggressive broken-windows-oriented policing… As mental health facilities close, police become the first responders to calls for assistance with mental health crises. As youth are left without adequate schools, jobs, or recreational facilities, they form gangs for mutual protection or participate in the black markets of stolen goods, drugs, and sex to survive and are ruthlessly criminalized. Modern policing is largely a war on the poor that does little to make people safer or communities stronger, and even when it does, this is accomplished through the most coercive forms of state power that destroy the lives of millions."* [1]
> *Alex S. Vitale*

## 2. BACKGROUND

Downtown Los Angeles is a tale of two cities – composed of very rich and very poor people living in close proximity to one another. A frenzied dash for land and air space has ignited a boom in the development of skyscrapers, trendy loft apartments, and social inequality. Spanning 50 blocks, Skid Row is an area in Downtown Los Angeles. It hosts the largest concentration of homelessness in the country. While Los Angeles has engaged in planning efforts to combat homelessness, there continues to be a lack of commitment and political courage to implement the necessary and more difficult solutions. At the same time, there has been full support, political and otherwise, of a new and shining DTLA at the expense of those most in need of care.

> *"Almost all studies of homelessness cite the impact of deindustrialization on the working class and working poor in America. From the early 1970's to our current recession, tens of millions of manufacturing jobs have vanished from America, some to technology, some to overseas relocation, and some cheaper work processes…The second most cited reason for the growth in homelessness beginning in the late 1970's and 80's is "gentrification" – the popular term for the dramatic escalating rise and the price of housing in the cities and the conversion of single room occupancy apartments (SROs) and boarding houses into high cost condominiums and luxury apartments. Finally, indisputably the nations "war on drugs" and massive increase in the incarceration of Black's since 1980 (along with the parole, probation and other criminal authority over especially black men) have added to the number of homeless people".* [2]

'Skid Rows' are created by policy decisions and organized abandonment at the hands of duty bearers and elected officials. Such communities are manifestations of de-industrialization, failed housing policies, the war on drugs and mass incarceration, and intractable structural racism that locks away opportunity for some and simply discards others.

Conditions in the environments in which people are born, live, learn, work, play and worship, determine a wide range of health, functioning, and quality-of-life outcomes. Skid Row, when

[1] 'Our Ever-Deadlier Police State', Chris Hedges, Truthdig, 22 October, 2017
[2] The Routledege Handbook of Poverty in the United States, 'Breaking the Silence Homelessness and Race', David Wagner and Pete White, 2015, Chapter 42, Pg.
[3] The Routledege Handbook of Poverty in the United States, 'Breaking the Silence Homelessness and Race', David Wagner and Pete White, 2015, Chapter 42, Pg.
[4] 2016 Homeless Count Results Los Angeles County and LA Continuum of Care Los Angeles Homeless Services Authority, May 10, 2016

viewed through this lens, screams maligned neglect. There is no affordable housing, no access to education, no public safety, no availability of healthy foods, no health care system, no economic stability and no public investment in neighborhood and physical environment in the context of community and social activities. Dignity and human rights are denied on a daily basis sanctioned by elected leaders.

Race also remains a critical determinant in who actually exits and who remains homeless in Los Angeles. In the 2015 homeless count, Professor Gary Blasi, revealed an approximate 30% decrease in White homelessness and a 35% increase in Black homelessness. He also revealed that 1 in 22 Black men in Los Angeles were homeless and 1 in 47 Black women were homeless. This compared to 1 in 272 of other races and gender. The 2017 annual homeless count reported a 23% increase in homelessness across LA County and a 20% increase in the City of Los Angeles.[3] Even more disproportionately, Black people make up 62%[4] of the homeless community in Skid Row. The undeniable health disparities plaguing this community demonstrate a direct correlation between the location of environmental burdens and the racial/ethnic background of the most impacted residents.

Racial discrimination is a significant aspect of life for Skid Row residents, who deal with institutional racism and violent police surveillance on a daily basis.  In fact, decades of public policy failure resulted in the Los Angeles Police Department (LAPD) becoming the city agency responsible for managing the day-to-day lives of Skid Row residents. A mass of citations, ever increasing arrests, and countless claims of civil rights abuses reflect just how fixated the LAPD is on our most vulnerable members of society.

In April 2013 members of the Los Angeles Community Action Network (LACAN), including Skid Row residents, conducted a participatory action research project entitled, 'The Dirty Divide',[5] to accurately depict the vast disparities in public health infrastructure and general treatment that exists between the 'New Downtown' and Skid Row – exemplifying the "dividing line" of Main Street – where those west of the line are prioritized and served by the City and those east are further disenfranchised. The findings were alarming.

In summary, the research revealed:

- Skid Row residents are at risk of criminalization for low-level offenses such as littering, public urination, jaywalking, walking in the roadway and camping;
- People with less means do not have equitable levels of service;
- An inadequate number of trash receptacles are available in the Skid Row area;
- Trash in Skid Row is not frequently collected;
- There is a lack of public restrooms, increasing the risk of communicable diseases;
- The few restrooms that exist are poorly maintained, do not have toilet paper, soap or running water and are often out of service;
- The City of Los Angeles failed to take corrective measures issued in the County Department of Public Health's *'Notice of Violations'*.

---

[3] 2016 Homeless Count Results Los Angeles County and LA Continuum of Care Los Angeles Homeless Services Authority, May 10, 2016 https://documents.lahsa.org/Planning/homelesscount/2016/factsheet/2016-HC-Results.pdf
[4] Ibid #2.
[5] "The Dirty Divide in Downtown Los Angeles A Call for Public Health Equity", Los Angeles Community Action Network, March 2013

3

### 3. DEPARTMENT OF PUBLIC HEALTH RECOMMENDATIONS: *A Failure to Act*

On May 21, 2012 the Los Angeles County Department of Public Health conducted a report on public health risks in Skid Row, which highlighted extreme overcrowding and the lack of access to water and sanitation. It exposed the increased risk of communicable diseases from this public health failure, namely: "Meningitis, respiratory infections, enteric pathogens such as **Hepatitis A** and Salmonella, Staphylococcus Aureus (Staph) skin infections, Tinea infections (fungal), Pediculosis infections (lice), diarrheal disease, Tuberculosis, HIV, Hepatitis B and C, and Typhus."[6]

It issued the City of Los Angeles numerous "Notice of Violations" and "Recommendations" for their consistent refusal to take the public health issues related to trash, lack of trash cans, inadequate restroom facilities, lack of soap and water, poor or non-existent sanitation and vermin in Skid Row seriously.

***On June 5, 2013, the DPH released further findings from its follow up report:***

*"What is most critical in the May 2, 2013 survey findings is the continuing lack of access to fully operable and sanitary public restrooms for homeless residents in the Skid Row area. The 2012 survey noted that two of three Automatic Public Toilets (APTs) were either dirty/unsanitary or without hand wash soap. The 2013 survey revealed this condition to have deteriorated to a finding that three out of four (75%) APTs were inoperable. Re inspections conducted on May 15, 2013 again revealed the same number, though not all the same units, to be inoperable.*

*A comparison of urine/fecal matter locations to the four APT locations revealed that 16% of the total deposits occur within a 300 foot radius of APTs (Attachment IV). The number of deposits increases to 59% at a radius of 600 feet (Attachment IVa).*

*The figures suggest and we strongly recommend the installation of additional fully supplied and maintained restroom facilities strategically located with a maximum service radius of 300 feet between units. As referenced in our earlier report, access to restrooms and associated hand wash facilities serves to reduce the potential for disease transmission.*

*In response to the May 2012 survey findings, the City of Los Angeles abated most violations and/or reduced insanitary conditions to acceptable levels by August 2012. The City of Los Angeles subsequently implemented a two-tiered street cleaning program that includes limited (spot) street cleaning eight times a year and comprehensive cleaning on a quarterly basis. However, the 2013 Survey findings suggest that the schedule is insufficient in sustaining the compliance levels observed August 2012 as solid waste violations increased by 880/0; vermin violations increased by 100%, safety hazards increased by 62% and the presence of urine/feces on public streets increased by 82%*

*We recommend that the street cleaning schedule be reevaluated to incorporate aggressive mitigation strategies that are outcome based and measurable. Similarly, we recommend development of a proactive integrated pest management program that includes routine rodent breeding and harborage monitoring and abatement activities.*

---

[6] DPH Report of Findings-Request From the City of Los Angeles Public Health Issues In The Skid Row Area of Los Angeles, May 21, 2013

4

*Lastly, as illustrated in Attachment V, 26 of 38 (68%) trash receptacles provided serve two blocks (Le. San Julian and San Pedro Streets) and 12 receptacles (320/0) serve eight blocks (Le. Gladys, Stanford and Towne Aves., and Crocker Street) within the Skid Row Target area. We therefore recommend that trash receptacles, in addition to those already in place, be provided."[7]*

The inspections, notice of violations and recommendations did not happen simply because the City or County of Los Angeles wanted to protect its poorest residents and correct the human rights violations. To the contrary, it was the result of long-standing community organizing and legal campaigns driven by LA CAN in an effort to end the "dirty divide" that its members were facing on a daily basis; to stop the illegal displacement of people from residential hotels and apartments in the area – adding to the surge of encampments in Skid Row; to ensure a concrete investment into the health needs of a community long abandoned.

## 4. LEGAL OBLIGATION

When the moral imperative to protect and house poor people fails, legal obligations should ensure those protections are realized. The courts have reminded the City of Los Angeles of this duty time and again but it still struggles to comply with even the most basic standards of health and safety and the protection of rights and guarantees for its most marginalized residents. Instead of waiting to be compelled and spending enormous amounts of resources on the cost of litigation and settlements, the City of Los Angeles must take serious its obligations to its constituents.

### 4.1 *Federal And State Law As It Relates To Discrimination, Criminalization, The Right To Water & Sanitation And Health & Safety*

The principle of non-discrimination is a fundamental constitutional right in itself and is protected by the 14th Amendment; the California Constitution, Section 7 (which has an explicit requirement that the State Government may not deprive individuals of "life, liberty, or property without due process of law," or deny equal protection of the laws); and, Title II of the Americans with Disabilities Act ((ADA) prohibits discrimination against people with disabilities in State and local government services and requires reasonable accommodation, in many instances, to those with disabilities).

Freedom from unreasonable searches and seizures is a right protected by the Fourth Amendment. Courts have found that confiscating and destroying homeless persons' personal property in 'sweeps' or 'cleanups' may be a violation of their Fourth Amendment rights.

The right to free speech and expression is protected by the First Amendment. The courts have found begging to be protected speech;[8] therefore, laws prohibiting panhandling, solicitation, or begging may be unconstitutional.

The Eighth Amendment prohibits cruel and unusual treatment and includes the criminalization of otherwise innocent conduct such as: sleeping, eating, and urinating, which becomes unlawful when performed in public.[9]

---

[7] '**LA County Health Department Report**' *FOLLOW-UP REPORT REGARDING THE CURRENT CONDITIONS ON SKID ROW', June 5, 2013*
[8] Reed v. Town of Gilbert, 135 S.Ct. 2218 (2015)
[9] See People v. Kellogg, 14 Cal. Rptr. 3d 507 (Cal. Ct. App. 2004); Jackson v. Commonwealth, 604 S.E.2d 122 (Va. Ct. App. 2004).)

The City also has a responsibility to ensure its property, including public streets, do not create a dangerous condition. Government Code, § 830(a) defines a "dangerous condition" as such conditions of public property that create a substantial risk of injury to members of the general public, which includes houseless individuals. "A public entity is liable for injury caused by a dangerous condition of its property if it is established that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and either: (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

Los Angeles County Code, Title 11 Health & Safety, Section 11.38.560[10] instructs that public restrooms must be kept:

> "in good repair and free from dirt, filth and corrosion… be adequately supplied with running water…well ventilated and lighted…kept supplied with soap and individual towels with a receptacle for their disposal… All toilet facilities shall be kept supplied with toilet paper…there shall be maintained hand-washing facilities for the public…"[11]

In 1928, the state constitution[12] was amended to affirm that water should be conserved for the "interest of the people and public welfare." Two decades later, California water regulations codified[13] the use of water for domestic purposes as the highest priority for the use of water.

The California Public Utilities Code,[14] 1993 Section 739.8. (a) states: "Access to an adequate supply of healthful water is a basic necessity of human life, and shall be made available to all residents of California at an affordable cost."

In 2013, California enacted the Human Right to Water Act, AB 685,[15] which statutorily recognizes that "every human being has the right to safe, clean, affordable, and accessible water adequate for human consumption, cooking, and sanitary purposes."

Under AB 685, state agencies should identify populations facing water challenges, prioritize securing access to clean water, and address the underlying causes to ensure fulfilment of the human right to water. A crucial component of the right to water and sanitation in California law is that everybody is ensured access to water and sanitation, including the most vulnerable or marginalized groups,[16] without discrimination.

---

[10] Title 11: Health & Safety of the Los Angeles County Code; http://ordlink.com/codes/lacounty/index.htm

[11] https://www.smgov.net/departments/council/agendas/2011/20110117/s2011011707-A-3.pdf

[12] Cal. Const. art. XIV, § 3 (1928) (superseded by Cal. Const. art. X, § 2 (1976); CALIFORNIA CONSTITUTION - ARTICLE X WATER SEC. 4. "No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this State, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this State shall be always attainable for the people thereof."

[13] Cal. Water Code § 100 (West 2012)), reads in pertinent part:
"…use of water … is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare."
Cal. Water Code § 106.3(a). States "It is hereby declared to be the established policy of the state that every human being has the right to safe, clean, affordable, and accessible water adequate for human consumption, cooking, and sanitary purposes."

[14] http://www.legaltips.org/california/california_public_utilities_code/.

[15] California Water Code § 106.3, effective January 1, 2013 (A.B. 685, 2011-2012 Leg., Reg. Sess. (Cal. 2011).

[16] UNDP, Beyond scarcity: Power, poverty and the global water crisis, 2006, p. 18

### *4.2 International Standards*

The right to water is enshrined in the International Bill of Human Rights. This right should also be seen in conjunction with other rights as fundamental and indispensable for survival, health and leading a life in human dignity.

- The Universal Declaration of Human Rights, Art. 25, recognizes "Everyone has the right to a standard of living adequate for the health and well-being of himself and of his family…"

- At the international level, the United Nations General Assembly recognized in the 1977 Mar Del Plata Action Plan that – regardless of the level of economic development – all peoples "have the right to have access to drinking water in quantities and of a quality equal to their basic needs." [17]

- In the Programme of Action of the International Conference on Population and Development, 1994, the 178 participating States explicitly recognized that all individuals have "the right to an adequate standard of living for themselves and their families, including adequate food, clothing, housing, water and sanitation". [18]

- The right to water has also been explicitly recognized in a number of legally binding international treaties, such as the Convention on the Elimination of All Forms of Discrimination Against Women, 1979 (CEDAW), the Convention on the Rights of the Child, 1989 (CRC) and the African Charter on the Rights and Welfare of the Child, 1990. The United Nations Committee on Economic, Social and Cultural Rights (CESCR), a body of independent experts mandated by ECOSOC to interpret and monitor the implementation of the International Covenant on Economic Social and Cultural Rights, 1966 (ICESCR), [19] which is currently ratified by 157 States.[20]

- In November 2002, the Committee on Economic, Social and Cultural Rights adopted **General Comment No. 15** on the right to water. Article I.1 states that "The human right to water is indispensable for leading a life in human dignity. It is a prerequisite for the realization of other human rights". Comment No. 15 also defined the right to water as the right of everyone to sufficient, safe, acceptable and physically accessible and affordable water for personal and domestic uses.[21]

- The United Nations took further[22] steps in promoting the right to water. [23] On July 28, 2010, the U.N. General Assembly, in Resolution 64/292, recognized "the right to safe and clean drinking water and sanitation as a human right that is essential for the full enjoyment of life and all human rights." The United Nations also called upon Member States to provide the resources, in particular to developing countries, necessary to secure

---

[17] Report of the United Nations Water Conference, Mar del Plata, 14-25 March 1977, U.N. Doc.E/Conf.70/29 (1977), at pp. 66-67.
[18] Programme of Action of the International Conference on Population and Development, Cairo, 1994, Chapter II, Principle 2.
[19] The full text and list of ratifications is available at www.ohchr.org (Click on 'Your Human Rights' > 'What Are Human Rights' > 'International Human Rights Law'
[20] In 2002 issued General Comment No. 15: The Right to Water (General Comment No. 15). UN Committee on Economic, Social and Cultural Rights, General Comment No. 15;, The right to water (Twenty-ninth session, 2002), U.N. Doc. E/C.12/2002/11 (2003)
[21] Committee on Economic, Social, & Cultural Rights, Substantive Issues Arising in the Implementation of the International Covenant on Economic, Social and Cultural Rights: General Comment No. 15 (2002): The Right to Water (arts. 11 and 12 of the International Covenant on Economic, Social and Cultural Rights), U.N. Doc. E/C.12/2002/11 ( Jan. 20, 2003), http://www2.ohchr.org/english/issues/water/docs/CESCR_GC_15.pdf; See also http://www.un.org/waterforlifedecade/human_right_to_water.shtml
[22] "In November 2002, the Committee on Economic, Social and Cultural Rights adopted **General Comment No. 15** on the right to water. Article I.1 states that "The human right to water is indispensable for leading a life in human dignity. It is a prerequisite for the realization of other human rights". Comment No. 15 also defined the right to water as the right of everyone to sufficient, safe, acceptable and physically accessible and affordable water for personal and domestic uses", http://www.un.org/waterforlifedecade/human_right_to_water.shtml
[23] http://www.un.org/waterforlifedecade/human_right_to_water.shtml

this right for all. In September 2010, Resolution 64/292 was affirmed by the Human Rights Council Resolution 15/9. In 2011, a U.N. report was issued containing initiatives for recognizing a right to water and sanitation.[24]

On August 24, 2012, in an official report to the United Nations Human Rights Council, UN Special Rapporteur on the Human Right to Water and Sanitation, Catarina de Albuquerque, said that the United States' failure to provide homeless persons access to water and sanitary facilities "could … amount to cruel, inhumane, or degrading treatment."[25] She also stated, "The United States, one of the wealthiest countries in the world, must ensure that everyone [has access] to sanitation which is safe, hygienic, secure and which provides privacy and ensures dignity. An immediate, interim solution is to ensure access to restroom facilities in public places, including during the night. The long-term solution to homelessness must be to ensure adequate housing."[26]

## 5. A RISK TO PUBLIC HEALTH

### 5.1 Hepatitis A Outbreak

Cases of Hepatitis A began appearing among homeless persons in LA County in June 2017. Currently 32 cases have been reported.  Given that the transmission of this virus is by the fecal-oral route, the homeless community is particularly vulnerable because of the poor sanitation and sparse hand-washing facilities in Skid Row. The spreading of this particular virus that thrives through poor sanitation was demonstrated in San Diego's recent outbreak of Hepatitis A., a situation that the city has responded to by quickly erecting more public restrooms.[27]

"The risk of hepatitis A infection is associated with poor sanitation and hygiene and is transmitted through ingestion of contaminated food and drink or through direct contact with an infectious person. The current outbreak has largely impacted people experiencing homelessness and some illicit drug users. The virus can live for months in a contaminated environment, particularly in the absence of good sanitation."[28]

The LAPD has taken a unique approach with its handling of sanitation efforts in Skid Row by issuing citations to LAVAMAE,[29] an organization that provides mobile showers and restrooms to homeless communities. They do this through converted public transportation buses to "deliver hygiene and rekindle dignity"[30] for the homeless, but were recently ticketed for a parking violation while providing wash stops for Skid Row residents. Ironically, at the same time, Councilmember Mike Bonin has touted the benefits of LAVAMAE to his constituents, mailing a circular in October to all residents in CD 11, showing Bonin with the LAVAMAE mobile services. So, what is accommodated as a solution on the affluent westside of Los Angeles is a crime on Skid Row.

To make matters worse there is a shortage of Hepatitis A vaccinations and a lack of education for those who are most at risk of exposure.

---

[24] Special Rapporteur on the Right to Water, The Human Right to Safe Drinking Water and Sanitation, Human Rights Council, ¶ 7, U.N. Doc. A/HRC/18/33/Add.1 (June 29, 2011) (by Catarina de Albuquerque).
[25] See Catarina de Albuquerque, On the Right Track: Good practices in realizing the rights to water and sanitation (2012), http://www.ohchr.org/Documents/Issues/Water/BookonGoodPractices_en.pdf; Int'l Council on Human Rights Policy, Local Government and Human Rights: Doing Good Service (2005) at 15-16, http://www.ichrp.org/files/reports/11/124_ report.pdf
[26] Report of the Special Rapporteur on the human right to safe drinking water and sanitation on her mission to the United States of America (22 February-4 March 2011), p.14, Para 60., http://www2.ohchr.org/english/bodies/hrcouncil/docs/18session/A-HRC-18-33-Add4_en.pdf
[27] 'San Diego steps up containment battle as hepatitis A outbreak kills 16', Sep 13, 2017, http://abcnews.go.com/Health/hepatitis-outbreak-kills-16-san-diego-steps-containment/story?id=49831013
[28] https://www.cdph.ca.gov/Programs/OPA/Pages/NR17-071.aspx
[29] https://www.youtube.com/watch?v=kAQOKa6PGOA, Pg. 2
[30] http://lavamae.org/about/

Public health safety concerns in Skid Row are not new. The LA County Department of Public Health survey of Skid Row found the lack of toilets, and the widespread use of the sidewalks and doorways in their place, posed a substantial risk for spreading diseases.

On November 10, 2017 DPH released its report, '*Hepatitis A-Public Hygiene Facilities',* to the Los Angeles Board of Supervisors in response to a October 10, 2017 Board motion instructing the department to 1) conduct surveys of homeless encampments identified by the Los Angeles Homeless Services Authority to assess where additional toilet, shower, and hand washing facilities are most needed; and 2) create a plan that identifies areas of high need and options for increasing additional toilet and hand washing facilities in those areas.

When reviewing the Skid Row portion of the DPH report LA CAN observed problematic misrepresentations:

- DPH noted the existence of 67 toilets within its Skid Row catchment area. They did not, however, indicate the hours of operation – it is a documented fact that there is no access to toilet facilities between the hours of 9 p.m. – 6 a.m.
- DPH does, however, recommend 87 showers and 87 hand wash sinks to be installed in Skid Row.
- DPH counted 180 tents in its skid row catchment area: Broadway Ave. (West) Santa Fe St. (East) 3rd St. (North) 10 Fwy (North). However, a November 24, 2017 tent count conducted by LA CAN covering a significantly smaller catchment area: Wall St. (West) Ceres St. (East) 4th Street (North) 7th Street (South), **totalled 477, which more than doubled the DPH count of a much wider area**.
- Based on October 20, 2017 population data provided by the Los Angeles Homeless Services Authority, DPH recorded a homeless population of 1,299 residents. This number is somewhat lower than research published in "No Place to Go", June 2017, which lists the population at 1,777.

The Economic Roundtable recently released, 'Who Counts', to highlight the inconsistencies among counts of houseless populations. Based on their findings, robust work must be carried out to create methods that result in the accurate representation of numbers of homeless people. Such discrepancies continue to do a disservice to homeless individuals in Skid Row placing their health in jeopardy. Miscounting Skid Row residents can have a deleterious impact on their lives.  Additionally, resources needed to adequately address the problems faced by residents are not properly apportioned when the problem is somewhat slashed.
"To be uncounted is to be unseen – to be left out of funding, planning and implementing programs to combat homelessness. To be helped, people experiencing homelessness must be seen and understood."[31]

---

[31] 'Who Counts? Assessing Accuracy of the Homeless Count' November 2017, https://economicrt.org/wp-content/uploads/2017/11/Who-Counts-11-21-2017.pdf



LAPD citing LAVA MAE for stopping to provide sanitation for kid Row residents, October 2017

### *5.2 Rats*

Skid Row has an obvious infestation of rats.[32] Feces, urine, rat droppings and roaches are thick on the streets of Skid Row. Rodents[33] carry a wide range of disease-causing organisms,[34] including many species of bacteria,[35] viruses, protozoa and helminths (worms).

They also act as vectors or reservoirs[36] for many diseases via their ectoparasites such as fleas, ticks, lice and mites, as well as some diseases carried by mosquitoes.  Common diseases caused by rodents include (but are not limited to): salmonella, Typhoid fever, Leptospirosis, Weil's disease, Rat-Bite fever and the Plague.

The May 2012, DPH Health Report regarding Skid Row,[37] advised the City of the need to start a vermin control program for burrows and breeding.  Survey teams observed an active rodent infestation in the area, with approximately 88 active burrows.

---

[32] Homeless residents in downtown Los Angeles speak of fighting off rats in their tents. Homeless outreach teams expanding across LA, September 9, 2017, http://abc7.com/society/homeless-outreach-teams-expanding-across-la/2394308/
[33] http://www.ph.lacounty.gov/acd/reports/spclrpts/spcrpt00/SeroprevAntiRatPathogens00.pdf
[34] https://www.cdc.gov/rodents/
[35] Salmonella, Typhoid fever, Leptospirosis, Weil's disease, Rat-bite fever, Plague, Tularemia, Bartonellosis, Hantavirus, Arenaviruses, Toxoplasmosis, Rat tapeworm, Capillariasis, Trichinellosis
[36] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3309692/
[37] "Corrective Action: Compliance with No. 4 listed on the NOV (notice of violation) dated May 21, 2012, by June 4, 2012.
Recommendation: Contract with DPH (Department of Public Health) to provide a vermin monitoring/rodent abatement program",
DPH Report of Findings-Request From the City of Los Angeles Public Health Issues In The Skid Row Area of Los Angeles, May 21, 2012

The report recommended a rodent abatement program and suggested that the City of Los Angeles "contract with DPH to provide a vermin monitoring/rodent abatement program."[38]

As a property owner, LA CAN contracts with a private pest management company. This effort, however, is insufficient to control the colony of vermin present in the public streets immediately adjacent to LACAN property. In an October 2017 conversation with DPH about this issue, it was revealed that post their 2012 inspection the City of Los Angeles declined to contract with them (DPH) to provide vermin abatement services. While aware of the situation, Environmental Health advised LA CAN that the city was responsible but that they would communicate our complaint to the appropriate parties and follow-up in the near future. DPH was also unclear whether or not the city indeed had a plan to address this problem. What is clear is that the solution to this problem is not something that will be achieved if shifted to individual business owners on a building by building basis.

## 6. WATER, RESTROOMS & HAND WASHING STATIONS IN SKID ROW

Water is life and a vital element needed to survive. Los Angeles' fight to get water has been the subject of acclaimed Hollywood movies, such as "Chinatown". It begs the question then why some people are denied access to it, or worse, given water unfit for human consumption. The life-threatening impact of adequate water is the subject of crises for low-income communities from Flint, Michigan to Puerto Rico. The lack of availability of water in Skid Row, however, is not the result of an infrastructure failure; rather, it is the result of deliberate indifference to a crisis on City Hall's doorstep impacting the health of thousands of people living on the streets of Skid Row.

Water security has always been an issue that the state recognizes as a need to be protected;[39] one, however, that has yet to be made available to all. In light of the recent Hepatitis A outbreak, restrooms, showers, hand washing stations, soap and water, and vaccinations are the only way to effectively contain its spread.

Significant barriers to water access exist for Skid Row residents. Public facilities in this area, such as parks, restrooms, and other public buildings, should provide important points of access but sadly do not.  Closing or limiting the hours of public restrooms and capping drinking fountains in parks and other public areas obstruct what is often the only source of water for houseless communities[40] and can effectively bar a group from accessing drinking water.[41] Limited access exacerbates the health problems of a community that already has a high percentage of individuals vulnerable to illness. Limited access may also result in increased criminalization as those in need are forced to secure alternative ways to meet their essential human needs.

Disadvantaged communities[42]—including impoverished unincorporated communities[43]—disproportionately bear the health and financial impacts of precarious or inadequate access to

---

[38] Id.

[39] American Declaration Of The Rights And Duties Of Man, 194891 Article XI: Right to the preservation of health and to well-being Every person has the right to the preservation of his health through sanitary and social measures relating to food, clothing, housing and medical care, to the extent permitted by public and community resources, http://www1.umn.edu/humanrts/oasinstr/zoas2dec.htm.

[40] Letter from Catarina de Albuquerque, U.N. Special Rapporteur on the human right to safe drinking water and sanitation, to Kevin Johnson, Mayor, Sacramento (Jan. 23, 2012).

[41] In applying the principle of non-discrimination, agencies should consider ways to prevent discrimination and address its impact. Relevant agencies should review policies and practices with an eye to identifying multiple and interrelated grounds of discrimination and the impact on California residents. For example, CDPH, DWR, and the State Water Board should identify those disadvantaged communities that do not currently have access or are at risk of losing access to safe water and revise policies and practices to address their needs. Second, agencies should involve vulnerable groups and marginalized communities in their planning and programming. For example, DWR should identify disadvantaged groups struggling to access safe and affordable water and engage these groups in efforts to formulate the California Water Plan Update. See generally, California Water Plan, Department of Water Resources, http://www.waterplan.water.ca.gov/.

[42] See Camille Pannu, Drinking Water and Exclusion: A Case Study from California's Central Valley, 100 Calif. L. Rev. 223, 245 (2012) [hereinafter Pannu].

safe water. Despite a history of proactive water policies, California residents, particularly those in Skid Row, still face formidable water challenges.

If you are in Skid Row and need to relieve yourself, hope that you are not 'restroom challenged', i.e. needing to frequent the bathroom (every hour or so); the need to go comes suddenly and urgently – as with the pregnant or elderly;[44] children;[45] and those with existing medical conditions[46]. Finding a working restroom is nearly impossible.[47]

Reasons given in the past for closing restrooms during the night were to "prevent criminal activity taking place there".[48] There is no evidence to suggest that shutting these restrooms prevented or decreased such activity. All it does is deny people the right to basic sanitation.[49] A number of restrooms in Skid Row are located in public parks, which are locked and inaccessible approximately 16.5 hours a day.[50] As noted in 'Dirty Divide' 2013, ATP's located on public sidewalks are also locked at dusk by LAPD.

A recent audit of the public toilet crisis in Skid Row found that 1,777 unsheltered homeless people had to share 9 toilets; "38% of audited toilets were not operating during supposedly open hours"[51] and the few existing toilets are "poorly maintained and inaccessible."



5th and Maple, Urine stains are visible, October 2017

---

[43] Unincorporated communities are defined as disadvantaged if they lack basic infrastructure, including, but not limited to, streets, sidewalks, storm drainage, clean drinking water, and adequate sewer service. See Cal Gov. Code §§ 56033.5, 56045 (West 2012).

[44] Researchers report that "among postmenopausal women … mean voided volume and maximum functional capacity were inversely related to patient age." See M.P. Fitzgerald, N. Butler, S. Shott, and L. Brubaker, "Bother arising from urinary frequency in women," Neurology and Urodynamics, vol. 21, no. 1:36-40, (2002), <http://www.ncbi.nlm.nih.gov/sites/entrez?db=PubMed>. Another expert says "the muscle of the bladder loses elasticity and tone. Hence, the bladder holds almost 50% less urine (causing more frequent urination) and empties less completely. The warning period between the urge and actual urination is shortened or lost as one ages. Muscular disability, spinal cord effects on the bladder muscle, tumors, infection, anatomic damage to the sphincters and/or bladder neck may cause incontinence in advancing age. Other risks for incontinence in old age include chronic disease, cognitive impairment, medications, smoking, pelvic muscle weakness, low fluid intake and environment." See Linda Breytspraak, "Does bladder capacity decrease with age, which leads to frequent urination?"

[45] Couture, "Forced Retention of Bodily Waste."

[46] Kathryn Anthony and Meghan Dufresne, "Potty Parity in Perspective: Gender and Family Issues in Planning and Designing Public Restrooms," Journal of Planning Literature, vol. 21, no. 3, 267-294 (2007). See also Rebecca Chalker and Kristene E. Whitmore, Overcoming Bladder Disorders: Compassionate, Authoritative, Medical and Self-Help Solutions for Incontinence, Cystitis, Interstitial Cystitis, Prostate Problems, Bladder Cancer. Harper Perennial, 1991; "Who are the Restroom Challenged?"

[47] Protecting public health is not just the responsibility of the city, the authority to address the adverse health effects that result if toilets are not available falls within the mandate of U.S. Department of Health and Human Services (DHHS), the lead agency of the United States Government responsible for protecting the health of all Americans, see U.S. Department of Health and Human Services, "HHS What We Do," http://www.hhs.gov/about/whatwedo.html/

[48] Mollie Vander, "County Postpones Plan for DP Bathrooms Indefinitely," Daily Nexus, (University of Santa Barbara, California), May 17, 2006, <http://www.dailynexus.com/news/2006/11739.html>;

[49] 29 CFR 1910.141, "Sanitation," <http://www.access.gpo.gov/nara/cfr/waisidx_06/29cfr1910_06.html>.

[50] Gladys Park, http://www.laparks.org/park/6th-gladys-street

[51] No Place to Go: An Audit of Public Toilets in Skid Row, June 2017, p9.

## *6.1 Women and Families*

Women suffer additional discrimination, often deprived of their dignity and sanitation needs as society has yet to deem gender specific needs[52] important. Women's need for restrooms is further amplified by the fact that they are oftentimes the main caretakers of dependants. Medical studies show the importance of regular urination, with women generally needing to void more frequently than men.

Adverse health effects that may result from voluntary urinary retention include increased frequency of urinary tract infections (UTIs), which can lead to more serious infections and, in rare situations, renal damage.[53] UTIs during pregnancy have been associated with low birth weight babies, who are at risk of additional health problems compared to normal weight infants.[54] Medical evidence also shows that health problems, including constipation, abdominal pain, diverticulitis, and hemorrhoids, can result if individuals delay defecation.[55]

In a Letter to the UN Special Rapporteur on Adequate Housing on Homelessness and the Right to Adequate Housing, in November 2015, Human Rights Watch wrote; "Homeless women frequently face grave challenges in realizing their rights to water and sanitation, including their ability to manage their menstruation. Women who are homeless often lack access to affordable sanitary supplies, as well as safe and dignified spaces like toilets and showers to handle their periods. This can contribute to vaginal infections and other health problems."[56]

Public restrooms, when stocked and in service, offer men all the supplies they need to care for themselves (toilet paper, paper towels, soap), while women rarely have the necessities they need. If there is an expectation that toilet paper will be provided at no cost in public restrooms, female sanitary products must also be included.[57] Presently, women are made to pay more for being female and needing medically necessary items.

> Ms. B has been a Skid Row resident for four years. She developed an intestinal infection because of prolonged periods of holding in feces and urine resulting from not being able to use a toilet as needed. She was hospitalized in August 2017. Upon her release Ms. B relocated to a busy intersection in Skid Row that had a toilet close by, as her restroom needs became more critical. She could not walk short distances and had to urinate frequently. Even with purposely placing herself close to a restroom, it was rarely accessible as it was either out of service or constantly occupied due to the lack of operating restrooms in Skid Row.

> Ms. B's condition is complicated and aggravated by the fact that she is HIV positive; she is often in pain and weak. She also has Chronic Obstructive Pulmonary Disease (COPD) and nerve damage in her hip, which renders the use of her right leg dysfunctional at times.

> Ms. B attributes her mental anguish and panic attacks to the difficulties in finding a restroom in Skid Row, the unsanitary state they are left in when she is able to find one in working order and the lack of sanitary and feminine products available.

---

[52] Menstrual Hygiene Day Links Periods and Human Rights, May 28, 2014, https://www.hrw.org/news/2014/05/28/menstrual-hygiene-day-links-periods-and-human-rights
[53] Nielsen, A. Waite, W., "Epidemiology of Infrequent Voiding and Associated Symptoms," Scand J Urol Nephrol Supplement 157.
[54] Naeye, R.L., "Causes of the Excess Rates of Perinatal Mortality and the Prematurity in Pregnancies Complicated by Maternity Urinary Tract Infections," New England J. Medicine 1979; 300(15); 819-823
[55] National Institutes of Health Publication No. 95-2754, July 1995, Quoted in Schmidt and Brubaker, "The Code and Practice."
[56] https://www.hrw.org/news/2015/11/12/letter-un-special-rapporteur-adequate-housing-homelessness-and-right-adequate
[57] The Equal Protection Clause of the Fourteenth Amendment to the Constitution provides, "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

Ms. B has been apprehended by LAPD on countless occasions for having what she calls, "accidents", where she is unable to "hold it" and either ticketed or humiliated by police for bodily functions she is unable to prevent.

## 6.2 Department of Public Health Recommendations and United Nations Standards

In the DPH's 2013 recommendations, it noted that, Skid Row's existing number of public restrooms fell woefully short of what in fact was needed to accommodate the health needs of current homeless residents. In 2017 hardly any progress has been made towards making the recommendations a reality.

The map on page 15 created by the American Institution of Architects (AIA) is based on DPHs 2013 recommendation that toilets be placed within 300ft distance of each other. The map also details the location of APT's currently in Skid Row.

The United Nations High Commissioner for Refugees recommends 1 toilet for every 20 persons in refugee camps and that no dwelling be more than 50 meters away from a toilet.[58] AIA created a second map (page 16), which illustrates compliance with those standards – in the refugee camp like conditions – created by the "policy of containment"[59] on the streets of Skid Row.

As evidenced by both maps they point to one obvious conclusion, restroom availability and hand-washing stations in Skid Row are woefully inadequate by all standards.

---

[58] UNHCR EMERGENCYHANDBOOK, Camp planning standards, https://emergency.unhcr.org/entry/115940/camp-planning-standards-planned-settlements#2,1511969959939
[59] SKID ROW: 'Containment Strategy' of Aiding Residents, Easing Impact on Business District Is Slow and Frustrating **August 05, 1985**, http://articles.latimes.com/1985-08-05/local/me-3525_1_skid-row/3

"OUT OF SERVICE": DIRTY DIVIDE UPDATE

November, 2017



RECOMMENDED PUBLIC RESTROOM SPACING PER 2012 LOS ANGELES DEPARTMENT OF PUBLIC HEALTH (LADPH)
1 PER 300 LINEAR FEET TO SERVE SKID ROW COMMUNITY

EXISTING RESTROOM (5)

NEW RESTROOM (110)

NOTE:
LAY-OUT REPRESENTS
MINIMUM SPACING PER
STANDARD AND DOES NOT
ACCOMMODATE EXISTING
BUILDINGS AND STREETS.

LA CAN_LOS ANGELES
COMMUNITY ACTION NETWORK  +  AMERICAN INSTITUTE OF ARCHITECTS_LOS ANGELES
DESIGN FOR DIGNITY TASK FORCE, VISUAL COMMUNICATIONS COMMITTEE

15

**"OUT OF SERVICE": DIRTY DIVIDE UPDATE**

November, 2017



RECOMMENDED PUBLIC RESTROOM SPACING PER UNITED NATIONS STANDARDS FOR REFUGEE CAMPS
1 PER 50 METERS (164 LINEAR FEET) TO SERVE SKID ROW COMMUNITY

**"OUT OF SERVICE": DIRTY DIVIDE UPDATE**

**November, 2017**

## 7. TRASH CANS IN SKID ROW



Wall and Boyd, trash goes uncollected for days, October 2017

In its 2013 publication, 'The Dirty Divide', LA CAN documented the lack of trash cans and trash collection in Skid Row and compared it to the abundance of trash cans and trash collection outside of the area in rapidly gentrifying areas of DTLA. They highlighted the attempts of Skid Row residents to clean the areas themselves, but without help from the City of Los Angeles, the ultimate task of refuse removal would prove impossible.

In 2014, after months of engagement with Los Angeles Department of Public Works and other bodies responsible to keep our streets and parks clean, LACAN released a follow-up report card on the progress made - and not being made - on this significant public health issue. The follow-up report again illustrated the vast public health disparities that existed between the service in gentrifying areas and in Skid Row.

As a result of that report card, subsequent advocacy, and organizing, LA CAN was able to secure 32 trash cans in heavily populated streets but even after that victory, trash removal remained nearly non-existent.

17

"OUT OF SERVICE": DIRTY DIVIDE UPDATE

November, 2017



Skid Row residents take to cleaning the streets themselves, 6ᵗʰ and Gladys, October 2017



A different scene on 5ᵗʰ and Spring, October 2017

As part of this report, a review and follow-up of LA CAN's 2014 trashcan mapping has been included. Many of the trash cans that were added were subsequently removed, even though residents still live in those areas and the population has dramatically increased. Per LA CAN's November 2017 count; the City of Los Angeles has added 28 trash cans in 14 locations within Skid Row. Oddly, at the same time, the City removed 8 trash cans, meaning a net gain of 20 trash cans in four years. In that same time period, the Point-in-Time Homeless Count estimates that the houseless population in the city has increased by thousands, with many of those now living in Skid Row.

Four years later the Historic Core and Arts District still enjoy streets that are visibly absent of huge piles of debris and trash cans that are left overflowing. This does not mean that these areas are without trash; it simply means they are provided with the means to dispose of it and that there is more attention paid to removal of trash in these neighborhoods.

After LA CAN pushed the mayor's office to respond to the fact that Skid Row residents were using their own limited resources (general relief and supplemental security income checks) and relying heavily on LA CAN's brooms, rakes and cleaning supplies to clean the streets themselves,[60] the mayor's office provided some cleaning tools. This gesture did not deal with the fundamental problem; it rather served as a band-aid to the deep wounds of public health equity.

---

[60] August 2017, Supplies given by Office of Mayor Eric Garcetti

18

## 8. CRIMINALIZATION OF THE SKID ROW COMMUNITY

Public health inequity and the criminalization of the Skid Row houseless population has given rise to an array of civil rights lawsuits. The city was sued for "undertaking a mass practice and policy of clearing Skid Row and its surrounding areas of homeless people".[61] Additionally LAPD continues to use arrests for "minor quality of life offenses"[62] and criminalizing conduct that cannot be avoided where restrooms and shelter are not available.[63]

LA CAN's legal clinic dealt with 156 such citations issued to houseless Skid Row residents who used their service, between 2016-2017. In recent months, the number of persons seeking assistance from the clinic has doubled.

Recently, the United States Department of Justice filed a Statement of Interest in a case pending in the district court in Boise, Idaho. In its Brief addressing the criminalization of homelessness the Department of Justice stated *"Sleeping is a life-sustaining activity — i.e., it must occur at some time in some place… If a person literally has nowhere else to go, then enforcement of the anti-camping ordinance against that person criminalizes her for being homeless."[64]*

In 2006 the 9th U.S. Circuit Court of Appeals ruled the Los Angeles' ban on lying or sleeping on public sidewalks amounted to cruel and unusual punishment because there were not enough shelter beds for the city's huge homeless population.[65] In 2012, the Court of Appeals held that Los Angeles could not seize and destroy the property of homeless individuals which was on sidewalks because of the ruling in Jones.[66] However, despite repeated rejections of its policies by the federal courts, the LAPD continues to conduct illegal street sweeps, confiscate personal property and forcefully remove temporary shelters.

According to the UCLA Million Dollar Hoods report centered on houseless arrests by the LAPD between 2011 and 2016,[67] LAPD arrests of houseless persons increased 37%. An alarmingly high number of arrests were for CA PC § 853.7, failure to appear. The relationship between numerous quality-of-life offenses, exacerbated by failure to appear, creates a unique, exclusive and unjust package of punishment with the injurious stigma of a criminal record. In the same report, of LAPD homeless arrests: 41% were Black, compared to 28% Hispanic and 27% white. The criminal justice system is riddled with discriminatory practices.

The August 16, 2016 Chief of Police's 2nd Quarter Report on Homelessness and Mental Illness found that during the first two quarters of 2017, 1,845 homeless and mentally ill individuals were arrested, "which represents a 49% increase"[68] for the same period last year. This evidence shows that people are being arrested for being sick and, in public places. LAPD are notorious for arresting individuals who are in need of care.[69]

---

[61] Mitchell v. City of Los Angeles, Case 2:16-cv-01750-SJO-JPR Document 51 Filed 04/13/16 Page 1 of 11 Page ID #:814, https://www.clearinghouse.net/chDocs/public/PN-CA-0038-0004.pdf
[62] *Ibid.*
[63] See People v. Kellogg, 14 Cal. Rptr. 3d 507 (Cal. Ct. App. 2004); Jackson v. Commonwealth, 604 S.E.2d 122 (Va. Ct. App. 2004).); Robinson v. California, 370 U.S. 660 (1962); Powell v. Texas, 392 U.S. 514 (1968)
[64] Bell v. City of Boise, Case 1:09-cv-00540-REB Document 276 Filed 08/06/15 Page 11 of 17, https://www.justice.gov/opa/file/643766/download
[65] http://www.latimes.com/local/lanow/la-me-ln-homeless-attorney-fees-20140910-story.html
[66] Lavan v. City of Los Angeles, 693 F.3d 1022, 1027 (9th Cir. 2012)
[67] 'A Million Dollar Hoods Report', Policing the Houseless Arrests by LAPD (2011-2016), Danielle Dupuy MPA, Terry Allen MA, and Kelly Lytle Hernández PhD, and the Million Dollar Hoods Team, October 2017
[68] Intradepartmental Correspondence, 2nd Quarter Report To Board Of Police Commissioners On Homelessness And Mental Illness, August 16, 2017, p.2. http://www.lapdlpolicecom.lacity.org/082217/BPC_17-0327.pdf
[69] 'Woman Might Face Life in Prison for Raising Officer's Baton in Fatal Skid Row Altercation', July 24, 2015, http://www.nbclosangeles.com/news/local/Homeless-Woman-Faces-Potential-Life-Sentence-Grabbing-LAPD-Officers-Baton-318430681.html

In his article, which focuses on dealing with ever increasing arrests of mentally ill and homeless individuals, Los Angeles City Councilman Jose Huizar wrote, "A police officer shouldn't be the first response".[70] His district however, happens to top the list of destinations where houseless people are arrested most frequently.

Ethan Couch's case of 'affluenza'[71] reminds us that extreme wealth shields criminal culpability. If you can afford it, you can buy liberty. Needless to say, houseless individuals often have no resources so cannot make bail[72] and are often encouraged to accept plea bargains that do not serve their best interests. For something as simple as jaywalking or drinking a beer in public, the unhoused person may lose benefits, housing eligibility and employment opportunities.





*Wealthy residents in downtown Los Angeles enjoy parklets in their neighborhoods, water fountains for their pets, and poop pads and bags for their canines (the bags are provided, free of charge). They may choose to rest for a moment or relax for hours upon end. They can sit at any time night or day. A few blocks over however, in Skid Row paints quite a different picture! The houseless must be on the move and thanks to the Jones Decision[1], may stay in one place for a maximum of nine (9) hours (between the hours of 9 p.m. and 6 a.m., when they are promptly woken up by law enforcement and told to move on) otherwise - risk citation for violating the laws as an infraction or a misdemeanor.*

[70] Mental Health Crisis Is a Crime, But it Shouldn't Be, October 23, 2017, By Councilmember José Huizar, http://www.ladowntownnews.com/opinion/mental-health-crisis-is-a-crime-but-it-shouldn-t/article_235add00-b5e2-11e7-9d12-cb43d3169f36.html
[71] http://www.latimes.com/opinion/opinion-la/la-ol-affluenza-texas-case-20131213-story.html
[72] "Not in it for Justice" How California's Pretrial Detention and Bail System Unfairly Punishes Poor People, April 11, 2017, https://www.hrw.org/report/2017/04/11/not-it-justice/how-californias-pretrial-detention-and-bail-system-unfairly

## 9. RECOMMENDATIONS

Human rights require a focus on the most vulnerable, those who are most often excluded from processes and resources. Often, these people are characterized as the most difficult to reach or serve, but this cannot be a justification for neglecting them. On the contrary - to eliminate human rights violations in practice, special attention must be paid to groups of individuals who suffer historical or persistent prejudice instead of merely comparing the treatment of individuals in similar situations. In order to respond to the human rights violations outlined in this report and begin to ensure public health equity, LA CAN recommends the following actions;

**1. Shift current political and governmental priorities and resources from criminalization to housing.** There is only one way to truly mitigate the lack of infrastructure needed to keep houseless residents healthy: provide safe, accessible and affordable housing for all. The morally bankrupt and unsustainable use of the LAPD as a response to homelessness is both costly and violates human and civil rights.[73] The immediate reprioritization of funding and other resources from enforcement to housing is a crucial step in securing permanent housing for houseless residents. Unfortunately, by LAPD's own estimates the arrest of homeless and mentally ill people increased by 49% when comparing 2016 and 2017 arrest patterns. We are headed in the wrong direction and this course must be corrected immediately.

**2. Place adequate numbers of trash receptacles in Skid Row.** The map created in 2013 ('Dirty Divide') still illustrates an alarming reality in 2017— residents in Downtown with less means still do not have equitable levels of service, particularly Black residents. It also is an example of the apartheid-like "dividing line" of Main Street – where those west of the line are prioritized and served by the City and those east are further disenfranchised. Trash cans are but a symptom of a larger caste-like system that is currently in place. Between 4 and 8 trash cans per block should be added throughout the entire Skid Row community, starting on Crocker, Towne and Stanford Streets, and should be the type that includes ashtrays.

**3. Frequent trash collection in Skid Row.** Residents that live indoors and outdoors accumulate trash. Residents unfortunate enough to live on city streets have few means of properly disposing of their garbage. Residents routinely clean this community and their areas but need adequate collection of this trash. The employment of residents and resident organizations to fulfill some trash disposal activities should also be explored. Additionally, cleaning supplies and environmentally safe disinfectants should be given to area residents.

**4. Immediately increase the number of restroom facilities available to residents.** Highlighted as a Threat to Immediate Public Health by DPH in 2012, the installation of at least (110) toilets should be installed immediately (commensurate with the DPH recommendation (see map above)) – that number must include hand-washing stations fully stocked with soap, water, paper towels and feminine hygiene products. Now is not the time for continued excuses for not increasing restrooms —deteriorating health conditions make none of us safer.[74] Additionally, all existing and new toilets must remain open 24-hours a day and not be locked at sundown as routinely occurs now. Restrooms must also be staffed during all hours of operation preferably by residents living in the Skid Row community.

---

[73] In 2015, the City's Chief Administrative Officer released a report estimating that the City had spent approximately $100 million dollars in the prior year on responding to the homelessness crisis.  The breakdown was $750,000 paid in attorney fees to the plaintiffs' lawyers in the *Jones* case, approximately $5,000,000 for services, and the remainder for police implementation of criminalization of the homeless.

[74] This report does not address the obvious disability access issues related to the lack of toilets and the type of toilets available in some public spaces.  This is, however, a concern that the City needs to address.

21

A person's restroom needs do not stop working after sundown, so neither should the restrooms.

**5. Frequently clean Skid Row restrooms and ensure toilet paper, feminine products, soap and hot water are available.** As our report highlights restrooms are routinely not open, or are functioning at substandard levels. The automated cleaning function on the self-cleaning toilets appears to be in need of repair and better monitoring. If the self-cleaning function is not sound, other steps need to be taken to ensure regular cleaning. Also, toilet paper and soap need to be routinely refreshed or made available. Lastly, the number of hand sinks for local residents need to be increased exponentially. At a minimum, hand wipe dispensaries should be installed throughout Skid Row as a temporary stop gap measure.

**6. Provide potable water sources for Skid Row residents.** It's important that fresh water be provided for Skid Row residents. A few temporary emergency water fountains were installed during the heat of summer in 2017 but were removed by the City of Los Angeles shortly thereafter. While the brief respite was a solid step in the right direction in the long term water fountains must be installed in numerous locations. Significant consideration has been given to the water needs of downtown's canine population living in the lofts — new parks adjacent to these residencies have been outfitted with drinking fountains for pets. It is imperative that the needs of human beings are met as well.

**7. Install Hygiene Centers at local parks or other accessible locations.** Public hygiene centers that include access to restrooms, showers, potable water and hand-washing stations should be installed at both of Skid Row's public parks and other accessible locations. Additionally, after years of advocacy and organizing the City has finally noted in its Comprehensive Homeless Strategy the need for such facilities and is currently working on the first as part of its "Emerald Necklace" Initiative. However, one facility is not enough.

**8. Develop a community health council to address issues for the long-term.** Residents and volunteers have long attempted to find ways to address the lack of public sanitation infrastructure in Skid Row. Their experiences and innovations should be the foundation of any plan to improve public health equity. Representatives should include residents, health care professionals, appropriate public agencies, elected officials' staff, neighborhood council representatives, and other interested parties. While there have been recent overtures by the Mayor's "Emerald Necklace" team to include residents in conversation, decision-making authority still elude those most impacted by the issues.

> *"L.A. said loud and clear we need to build more housing, we need to build more affordable housing and we need to build more housing for the homeless".*[75]
> **Mayor Eric Garcetti**

These words must be realized and not just spoken.

---

[75] 'For Homeless Advocates, a Discouraging Lesson in Los Angeles: Money Is Not Enough', September 29, 2017, https://www.nytimes.com/2017/09/29/us/homeless-housing-los-angeles.html